IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO



FILED
At Albuquerque NM

SEP 16 2010

MATTHEW J. DYKMAN
CLERK

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
vs. )  CRIMINAL NO. *10-CR-2626*
)
**PEDRO LEONARDO** )  Count 1: 42 U.S.C. §§ 2274(a) and 2014, Conspiracy
**MASCHERONI**, also known as )  to communicate Restricted Data;
"Luke," and )
**MARJORIE ROXBY** )  Counts 2 and 3: 42 U.S.C. §§ 2274(a) and 2014,
**MASCHERONI**, )  Communication of Restricted Data, and 18 U.S.C. §
)  2(a), Aiding and abetting;
    Defendants. )
)  Count 4: 42 U.S.C. §§ 2122, 2272(b), and 2014,
)  Conspiracy to participate in the development of an
)  atomic weapon;
)
)  Count 5: 42 U.S.C. §§ 2122, 2272(b), and 2014,
)  Attempt to participate in the development of an
)  atomic weapon, and 18 U.S.C. § 2(a), Aiding and
)  abetting;
)
)  Count 6: 18 U.S.C. § 371, Conspiracy;
)
)  Counts 7 and 8: 18 U.S.C. §§ 641 and 2(a), Public
)  money, property or records, and Aiding and abetting;
)
)  Count 9: 18 U.S.C. §§ 641, Public money, property
)  or records;
)
)  Counts 10 - 15: 18 U.S.C. §§ 1001(a)(2), False,
)  fictitious, or fraudulent statement or representation;
)
)  and
)
)  Counts 16 - 22: 18 U.S.C. §§ 1001(a)(2), False,
)  fictitious, or fraudulent statement or representation.

# INDICTMENT

The Grand Jury charges:

## INTRODUCTION

At all times material to this indictment:

1.     Los Alamos National Laboratory ("LANL") is one of the United States' three nuclear weapons laboratories.  As a United States Department of Energy (or its predecessor, the United States Energy Research and Development Administration) laboratory, LANL performs sensitive national security missions, including helping to ensure that the United States' nuclear weapons stockpile is safe, secure, and reliable.  Since June 1, 2006, Los Alamos National Security LLC ("LANS") has served as the management and operations contractor for LANL, succeeding the University of California.  LANL is located within the State and District of New Mexico.

2.     Scientists within the Applied Theoretical Physics, or X, Division at LANL possess expertise in nuclear weapons physics and related national security issues.  Scientists in the X Division research, design, and develop nuclear weapons in the U.S. nuclear arsenal.  The X Division employs high levels of physical and other security measures for the safeguarding of classified information contained at LANL.

3.     Defendants **PEDRO LEONARDO MASCHERONI**, also known as "Luke," ("**MASCHERONI**") and **MARJORIE ROXBY MASCHERONI ("ROXBY MASCHERONI")** reside in Los Alamos, New Mexico.  Defendant **MASCHERONI** is a naturalized United States Citizen, having been born in Argentina.  He holds a Ph.D. in Physics from the University of California, Berkeley.  From on or about August of 1979, until on or about

April of 1987, Defendant **MASCHERONI** worked at LANL, assigned to the X Division and its predecessor as a Staff Member scientist. Within the X Division, Defendant **MASCHERONI** was assigned to a group known as Group X-1. Defendant **MASCHERONI** held a security clearance, or "Q" clearance, beginning in October of 1979. Defendant **MASCHERONI's** "Q" clearance was terminated in March of 1988, when he left LANL. With a "Q" clearance Defendant **MASCHERONI** could access certain classified information, including Restricted Data. While employed in Group X-1 at X Division, Defendant **MASCHERONI** was exposed to information about the research, development, and design of United States nuclear weapons. On or about April of 1987, Defendant **MASCHERONI** moved to LANL's Nuclear Technology and Engineering, or N, Division. Defendant **MASCHERONI's** employment with LANL ended on or about March 16, 1988.

4.      Beginning on or about 1981, Defendant **ROXBY MASCHERONI** worked at LANL. In LANL's Technology Transfer section her duties included technical writing and editing. Defendant **ROXBY MASCHERONI** held a "Q" clearance beginning on or about January of 1982. A "Q" clearance permitted Defendant **ROXBY MASCHERONI** access to certain classified information, including Restricted Data. Defendant **ROXBY MASCHERONI** earned a Bachelor of Arts in Fine Art from the University of California, Berkeley. On the resume she submitted to LANL in approximately 1981, Defendant **ROXBY MASCHERONI** wrote: "I have been my physicist husband's technical editor/writer, proof-reader and, occasionally, typist since 1966. Due to the fact that Dr. Mascheroni is from a non-English speaking background, and has no formal training in the English language, this has frequently been a demanding task.

Although I do not hold a B.A. in English, or a B.S. degree, I feel that I have had sufficient

exposure to technical terminology from many years of experience to be considered for a position

as a technical editor."

5.     Under 42 U.S.C. § 2014(y), the term "Restricted Data" means all data concerning:

(1) the design, manufacture, or utilization of atomic weapons; (2) the production of special

nuclear material; or (3) the use of special nuclear material in the production of energy, but does

not include data that the government has declassified or removed from the Restricted Data

category pursuant to the terms of a federal statute.  As such, Restricted Data is classified

information.

6.     Under 42 U.S.C. § 2014(d), "atomic weapons" are any devices that utilize energy

released in the course of nuclear fission or nuclear transformation, exclusive of the means for

transporting or propelling the device (where such means is a separable and divisible part of the

device), the principal purpose of which is for use as, or for development of, a weapon, a weapon

prototype, or a weapon test device.

<u>DEFENDANTS' STATEMENTS REGARDING NON-DISCLOSURE OF CLASSIFIED
INFORMATION</u>

7.     On or about June 1, 1979, in connection with obtaining a security clearance for his

work at LANL, Defendant **MASCHERONI** signed a statement wherein he acknowledged,

among other things, that he was restricted from distributing classified information, including

Restricted Data.  During his employment at LANL and continuing even after he was no longer

employed at LANL, Defendant **MASCHERONI** signed additional statements in connection with

his security clearance or access authorization similar to the statement he signed on or about June

4

1, 1979, including on or about September 28, 1987, March 31, 1988, October 20, 1989, and February 8, 1991, wherein he acknowledged that he was not free to share classified information and that penalties attached to unauthorized disclosures.

8. On or about September 15, 1981, in connection with obtaining a security clearance for her work at LANL, Defendant **ROXBY MASCHERONI** signed a statement wherein she acknowledged, among other things, that she was restricted from distributing classified information, including Restricted Data. During her employment at LANL Defendant **ROXBY MASCHERONI** signed additional statements in connection with her security clearance or access authorization similar to the statement she signed on September 15, 1981, including on or about April 28, 1999, and May 2, 2005, wherein she acknowledged that she was not free to share classified information and that penalties attached to unauthorized disclosures.

### DEFENDANTS' COMMUNICATIONS AND ACTIVITIES CONCERNING DEFENDANT MASCHERONI'S PROGRAM FOR DEVELOPING NUCLEAR WEAPONS FOR VENEZUELA

#### March 29-30, 2008, phone calls and meeting

9. On or about March 29, 2008, in Santa Fe, New Mexico, Defendant **MASCHERONI** had a phone conversation with an undercover FBI Agent ("undercover agent") who was portraying a representative of the government of the Bolivarian Republic of Venezuela. The undercover agent told Defendant **MASCHERONI** that his name was Luis Jimenez ("Jimenez"). Defendant **MASCHERONI** and "Jimenez" arranged to meet the next day at a Santa Fe hotel. Defendant **MASCHERONI** told "Jimenez" that he had a Ph.D. and had worked at LANL for approximately 10 years. Defendant **MASCHERONI** told "Jimenez" that he planned to visit Venezuela in approximately October, 2008, and that he wanted to give

presentations to people very close to Venezuela's ministers of energy and defense. Defendant **MASCHERONI** told "Jimenez" that he had seen Hugo Chavez give a presentation on TV that Defendant **MASCHERONI** thought was a good presentation.

10. On or about March 29, 2008, Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** about his upcoming meeting with "Jimenez," which he characterized as "secret." Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** that he was telling her about the meeting because he wanted her to know that everything was going OK, he did not want to get kidnaped, and he wanted her to check on him by calling him at 12:30 the next day, which is when he expected to be out of the meeting with "Jimenez." Defendant **ROXBY MASCHERONI** called Defendant **MASCHERONI** shortly after 12:30 the next day, while Defendant **MASCHERONI** was meeting with "Jimenez."

11. On or about March 30, 2008, at a hotel in Santa Fe, New Mexico, Defendant **MASCHERONI** met with "Jimenez." At that meeting, among other things:

      (a) Defendant **MASCHERONI** discussed his program for developing nuclear weapons for Venezuela, which included a laser Defendant **MASCHERONI** described as being capable of blinding satellites;

      (b) Defendant **MASCHERONI** described Venezuela as a country the United States considered a "list nation;"

      (c) Defendant **MASCHERONI** told "Jimenez" that their meeting had to be in absolute confidence and also explained how he would need to be careful about security;

(d) Defendant **MASCHERONI** told "Jimenez" that nuclear weapons were a useful means by which smaller countries could deter larger countries from engaging in conflict and that he, Defendant **MASCHERONI**, could deliver a nuclear bomb in 10 years;

(e) Defendant **MASCHERONI** also discussed a scenario in which Venezuela could possess 40 missiles with nuclear warheads by the year 2020;

(f) Defendant **MASCHERONI** further explained how Venezuela would be Latin America's "umbrella," such that Venezuela would inform other countries that if any country outside Latin America attacked a Latin American country, Venezuela would "retaliate with [a] nuclear bomb;"

(g) Defendant **MASCHERONI** told "Jimenez" that after Venezuela conducted a test of its nuclear weapons, Venezuela could cause an explosion over New York that would result in an electromagnetic pulse ("EMP") that he contended would not kill anybody but would destroy all the electric power in New York;

(h) Defendant **MASCHERONI** told "Jimenez" that, because he would be able to put Venezuela on the right track from the beginning in regard to building nuclear weapons, Venezuela would be ahead of LANL and the United States;

(i) Defendant **MASCHERONI** suggested that Venezuela might seek to obtain "a high explosive package" from Iran;

(j) Defendant **MASCHERONI** discussed how in his program Venezuela

would build and test nuclear bombs in secret and would have two nuclear

reactors -- one open, above ground reactor used for producing nuclear

energy and the other, a secret underground nuclear reactor used for

producing and enriching plutonium. In his program, Venezuela would

build an above-ground micro-fusion facility for developing energy, and an

underground micro-fission facility where Venezuela would conduct

undetectable tests of "micro bombs;"

(k)     Defendant **MASCHERONI** informed "Jimenez" that Defendant

        **MASCHERONI** and the Department of Energy were "enemies;"

(l)     Defendant **MASCHERONI** told "Jimenez" that, without a "Q" clearance,

        even individuals in the Department of Defense are prohibited by the

        Atomic Energy Act of 1954 from knowing how nuclear weapons work;

        and

(m)     Defendant **MASCHERONI** told "Jimenez" that he had become a citizen

        of the United States in 1972 and asked "Jimenez" if he, Defendant

        **MASCHERONI**, could obtain Venezuelan citizenship.

March 31, 2008 meeting

12.     On or about March 31, 2008, in Santa Fe, New Mexico, Defendant

**MASCHERONI** again met with "Jimenez" to discuss further Defendant **MASCHERONI's**

nuclear weapons development program for Venezuela. This meeting took place at the same hotel

where the March 30, 2008, meeting had taken place. During the meeting that took place with

"Jimenez" on or about March 31, 2008, among other things:

(a)     Defendant **MASCHERONI** told "Jimenez" that all of their conversations were "classified;"

(b)     Defendant **MASCHERONI** asked "Jimenez" whether he was "like a CIA guy for Venezuela." "Jimenez" told Defendant **MASCHERONI** that they should "leave it at 'intelligence;'"

(c)     Defendant **MASCHERONI** reiterated to "Jimenez" that Venezuela should have 40 warheads and 40 missiles;

(d)     Defendant **MASCHERONI** told "Jimenez" that a map of targets would be needed in case there was a war;

(e)     Defendant **MASCHERONI** told "Jimenez" that they were going to have a "cover up strategy;"

(f)     Defendant **MASCHERONI** told "Jimenez" about his "university strategy." To provide Defendant **MASCHERONI's** nuclear weapons development program with cover, the "university strategy" consisted of involving a United States university and a Venezuelan university in unclassified energy research;

(g)     Defendant **MASCHERONI** told "Jimenez" that he expected to have two salaries -- one from a Venezuelan university where he would be a professor and another for his classified work on Venezuela's nuclear weapons development program; and

(h)     Defendant **MASCHERONI** told "Jimenez" that in the future, "Jimenez"

should address Defendant **MASCHERONI** as "Luke." Defendant

**MASCHERONI** also told "Jimenez" that he was going to set up an email

account that he would use only to communicate with "Jimenez." The

email account Defendant **MASCHERONI** set up for this purpose was

"Luke0735@aol.com." On several occasions, Defendant

**MASCHERONI** and "Jimenez" communicated using the

"Luke0735@aol.com" email account.

13.    Following the March 31, 2008, meeting, and continuing through on or about

October, 2009, Defendant **MASCHERONI** and "Jimenez" communicated via telephone, email

(utilizing Defendant **MASCHERONI's** "Luke0735@aol.com" account), another face-to-face

meeting, and by leaving material for each other to retrieve at a specified location ("dead drops").

May 23, 2008 dead drop

14.    On or about May 23, 2008, Defendant **MASCHERONI** delivered an envelope

that contained a compact disk to a Post Office Box in Albuquerque, New Mexico for "Jimenez"

to pick up ("dead drop #1").

15.    The FBI had obtained the Post Office Box that Defendant **MASCHERONI** used

for dead drop #1. "Jimenez" had mailed the key to the Post Office Box to Defendant

**MASCHERONI** and Defendant **MASCHERONI** and "Jimenez" had agreed to the details of

dead drop #1 in an exchange of emails prior to Defendant **MASCHERONI's** delivery. The

envelope that Defendant **MASCHERONI** delivered was addressed to "Jimenez" and the "from"

section of the envelope contained the name "Luke."

16. Defendant **ROXBY MASCHERONI** accompanied Defendant **MASCHERONI** to and from dead drop #1.

November 11, 2008, dead drop

17. On or about July 23, 2008, "Jimenez" sent Defendant **MASCHERONI** an email which "Jimenez" addressed to "Luke0735@aol.com" in which "Jimenez" provided Defendant **MASCHERONI** with a list of approximately 12 questions that were purportedly from Venezuelan military and scientific personnel.

18. On or about August 6, 2008, Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** that she had a lot of editing to do, and that "real money" was involved.

19. On or about November 11, 2008, Defendant **MASCHERONI** delivered a document and information that involved and incorporated Restricted Data to the same Post Office Box where dead drop #1 had occurred. In the November 11, 2008, dead drop ("dead drop #2") Defendant **MASCHERONI** left an envelope that contained a compact disk in the Post Office Box for "Jimenez" to pick up. The envelope was addressed to "Jimenez." On the disk was a document that Defendant **MASCHERONI** had written and that Defendant **ROXBY MASCHERONI** had edited, which included, among other things, Defendant **MASCHERONI's** answers to the questions he received on July 23, 2008, with a cover page that read, "A Deterrence Program for VA by Luke November 11, 2008." Defendant **MASCHERONI** had encoded the approximately 132-page document. "VA" was the code Defendant **MASCHERONI** used with "Jimenez" to stand for the word "Venezuela." The Department of Energy has confirmed that the

document and information Defendant **MASCHERONI** provided included Restricted Data.

20.     Defendant **ROXBY MASCHERONI** edited the document Defendant **MASCHERONI** delivered in dead drop #2 using a laptop computer that LANL had assigned to her.

21.     Defendant **ROXBY MASCHERONI** drove Defendant **MASCHERONI** to and from dead drop #2.

22.     On or about November 13, 2008, Defendant **MASCHERONI**, using the "Luke0735@aol.com" email account Defendant **MASCHERONI** set up to communicate with "Jimenez," emailed to "Jimenez" the "key" to decipher the code Defendant **MASCHERONI** used in the document he had entitled "A Deterrence Program for VA." The code was of the search and replace variety. For example, every "NU" in the document was to be replaced by the word "nuclear," every "AS" in the document was to be replaced by the word "weapon," and every "SP" in the document was to be replaced by the word "stockpile."

23.     The document entitled, in its decoded form, "A Deterrence Program for Venezuela," included what Defendant **MASCHERONI** called the program's "mission," that is, the development of a modern nuclear warhead without detectable nuclear testing. The document laid out Defendant **MASCHERONI's** nuclear weapons development program for Venezuela and how the program's mission was to be achieved. Defendant **MASCHERONI** wrote that part of the program's mission would be achieved by Venezuela developing a primary/atomic bomb, which he wrote could initially provide the total explosive power of the program's warhead. Defendant **MASCHERONI** had a 10-year "accelerated" program and a longer, 20-year option

for achieving the program's mission. In the document, among other things:

(a)     Defendant **MASCHERONI** wrote that his program for Venezuela should be based on the destruction of selected targets, including what Defendant **MASCHERONI** referred to as "enemy centers" that would need to be destroyed in case of an invasion against Venezuela. According to Defendant **MASCHERONI**, the United States would need to invade or control Venezuela within 10 to 20 years to control Venezuela's oil. Included in his description of enemy centers were airports, ports, roads, government centers, missile silos, and submarine and military bases;

(b)     Defendant **MASCHERONI** wrote, in its decoded form, that "security, intelligence, and counterintelligence must be excellent" due to concerns about reported CIA information-gathering methods. Defendant **MASCHERONI** also wrote that "[s]ecurity must be optimum and designed to defeat foreign intelligence, i.e., secret U.S. operations;"

(c)     Defendant **MASCHERONI** elaborated on what he had earlier referred to as his "university strategy," wherein legitimate research (including the building of a powerful laser) would, unbeknownst to most of the researchers, act as a "shield" to protect the secret components of Defendant **MASCHERONI's** nuclear weapons development program;

(d)     Defendant **MASCHERONI** also wrote about his conception of "global security." In its decoded form, Defendant **MASCHERONI** wrote that

13

"[o]il-producing [n]ations that acquire nuclear deterrence increase global security," and that "by nuclear deterring a likely act of aggression, Venezuela would make a strong contribution to global security." Defendant **MASCHERONI** wrote, "A deterrence against the U.S. based on conventional weapons is highly inadequate." Defendant **MASCHERONI** reiterated, "Venezuela cannot develop deterrence against a U.S. invasion using conventional weapons and that the only option for Venezuela is to develop nuclear deterrence." Defendant **MASCHERONI** also wrote, "After the mission has been achieved, Venezuela would show the world that [it] is a mature nuclear power able to deter a superpower." According to Defendant **MASCHERONI**, "What we do when we are in Venezuela, . . . is our business, not that of the U.S. government;" and

(e) Defendant **MASCHERONI** stated that the information he provided to Venezuela was worth millions of dollars. Defendant **MASCHERONI** charged $793,000 for producing the document. He wrote that his fee was based on his having worked on the document for 396.5 hours between July 27, 2008, and November 11, 2008, at a rate of $2,000 per hour.

June 28, 2009, dead drop

24.     During a phone conversation that took place with Defendant **MASCHERONI** on or about May 7, 2009, Defendant **ROXBY MASCHERONI** verbally edited part of an email Defendant **MASCHERONI** was going to send to "Jimenez."

14

25.     On or about June 28, 2009, Defendant **MASCHERONI** retrieved from the same Post Office Box where dead drops ##1 and 2 had occurred, a list of approximately 21 questions that were purportedly from Venezuelan military and scientific personnel, as well as $20,000 in $100 bills ("dead drop #3"). Accompanying the questions and cash was a cover letter from "Jimenez" that explained that the $20,000 was the first installment payment on the fee Defendant **MASCHERONI** had charged for preparing his November 11, 2008, document "on developing nuclear weapons for VA." The letter, questions, and cash were in an envelope marked "Luke."

26.     Defendant **ROXBY MASCHERONI** accompanied Defendant **MASCHERONI** to, and drove Defendant **MASCHERONI** from, the Post Office for dead drop #3.

27.     On the way to dead drop #3, Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** that what he was doing was very dangerous, that he was doing it for money, and that he was not an American anymore.

July 14, 2009, dead drop

28.     On or about July 8, 2009, Defendant **MASCHERONI**, using the email address "Luke0735@aol.com," sent an email to "Jimenez" wherein he informed "Jimenez" that on July 14, 2009, between 2:00 p.m. and 3:00 p.m, he would deliver his answers to the questions he had received on June 28, 2009, to the Post Office Box.

29.     On or about July 14, 2009, at approximately 2:15 p.m., Defendant **MASCHERONI** delivered a document and information that involved and incorporated Restricted Data to the same Post Office Box where dead drops ##1-3 had occurred. In the July 14, 2009, dead drop ("dead drop #4") Defendant **MASCHERONI** left an envelope that

15

contained a compact disk in the Post Office Box for "Jimenez" to pick up. In the corner of the envelope was written "Luke," and towards the center of the envelope was written "Jimenez." On the disk was a document wherein Defendant **MASCHERONI** answered the questions he had retrieved in dead drop #3. That document, which Defendant **ROXBY MASCHERONI** had edited, consisted of approximately 39 pages and provided additional information concerning Defendant **MASCHERONI's** nuclear weapons development program for Venezuela. The Department of Energy has confirmed that the document and information Defendant **MASCHERONI** provided included Restricted Data. A letter Defendant **MASCHERONI** had written to "Jimenez" and Venezuelan officials that had been edited by Defendant **ROXBY MASCHERONI** was also on the disk. Defendant **MASCHERONI** had again encoded both his letter and his answers, using the same code he had used in his November 11, 2008, document.

30.     One page of a draft version of the letter Defendant **ROXBY MASCHERONI** edited included the following quote, repeated from "Jimenez'" letter to Defendant **MASCHERONI**: "I hope you are pleased with the $20,000, which represents the first installment from VA to pay the fee you have charged us for preparing your November 11, 2008 paper on developing nuclear weapons for VA." That same page also included references to "atomic bombs," "nuclear primaries," "secondaries/warheads," "nuclear weapons," and "developing nuclear deterrence for VA without detectable testing." Between the words "nuclear" and "primaries" the handwritten word "weapons" was inserted.

31.     In some of his July 14, 2009, answers, Defendant **MASCHERONI** reiterated that the information he had provided to "Jimenez" was classified and that the source of the

information was his knowledge of U.S. nuclear tests about which he learned while he was working at LANL, including from his participation in the Weapons Working Group, his knowledge of weapons science and technology upon which he improved while he was working at LANL, and classified and other discussions with former colleagues. Defendant **MASCHERONI** also answered that he was the only source from which Venezuela could obtain accurate and reliable information about a specific classified program on which he had worked while at LANL and about which he had provided information to "Jimenez." Defendant **MASCHERONI** also wrote, "Just in case our relationship/alliance does not work ... I state that my paper is based on open information found in the Internet -- while in reality it is founded in my knowledge."

July 20, 2009, dead drop

32.     On or about July 20, 2009, Defendant **MASCHERONI** retrieved from the same Post Office Box where the previous dead drops had occurred, an envelope addressed to "Luke" that contained a bank statement and a cover letter addressed to "Luke" ("dead drop #5"). The bank account was in the name of an entity that the FBI had created. In the cover letter, "Jimenez" informed Defendant **MASCHERONI** that the bank statement, which was from a bank in St. Croix, U.S. Virgin Islands and reflected an account balance of $435,255.25, represented another installment payment of the fee Defendant **MASCHERONI** had charged for preparing his November 11, 2008, document. "Jimenez" informed Defendant **MASCHERONI** that he was waiting for Defendant **MASCHERONI** to provide him with Defendant **MASCHERONI's** overseas bank account information so that transfers of the money to Defendant **MASCHERONI** could begin.

17

33.     After Defendant **MASCHERONI** picked Defendant **ROXBY MASCHERONI** up from the airport on July 20, 2009, Defendant **ROXBY MASCHERONI** accompanied Defendant **MASCHERONI** to and from the site of dead drop #5.

August 15, 2009, meeting

34.     On or about August 15, 2009, Defendant **MASCHERONI** met "Jimenez" at a Hyatt Regency resort in New Mexico ("resort meeting"). During that meeting, Defendant **MASCHERONI** discussed his nuclear weapons development program for Venezuela and answered questions that "Jimenez" told him were part of the process for Defendant **MASCHERONI** to obtain a Venezuelan security clearance so that he could meet with Venezuelan officials. Defendant **ROXBY MASCHERONI**, who had planned to be in Idaho from August 13, 2009, until August 19, 2009, changed her plans and joined the meeting for approximately one hour. Also during the resort meeting, among other things:

(a)     Defendant **MASCHERONI** told "Jimenez" that he had traveled to the Venezuelan embassy in Washington, DC in late September of 2007, and that he had spoken with, and emailed, embassy personnel. Defendant **MASCHERONI** said that he told embassy personnel that he was "an expert in nuclear weapons;"

(b)     Defendant **MASCHERONI** told "Jimenez" that Defendant **MASCHERONI** "beat" the U.S. security system;

(c)     in the context of discussing a hearing in front of Congress that Defendant **MASCHERONI** was seeking in 2007, and having seen Venezuelan

President Hugo Chavez on TV, Defendant **MASCHERONI** said to "Jimenez," "in my mind I said, here we have something in common. If those guys, the American government, doesn't give me this, you know, I, I, the American government is going to be my enemy really;"

(d)    Defendant **MASCHERONI** told "Jimenez" that the scientists who would be working in the United States on the unclassified energy portion of his program would not know about "the group that will produce a bomb" because the scientists were very patriotic and "as soon as they know, the CIA and everything just come after us;"

(e)    Defendant **MASCHERONI** told "Jimenez" that he was going to go to the Argentine consulate in Houston, Texas on September 1, 2009, to obtain an Argentine passport; and

(f)    when Defendant **ROXBY MASCHERONI** was present, nuclear weapons were not discussed. Defendant **ROXBY MASCHERONI** told "Jimenez" that she was a writer and an editor but when asked whether she edited Defendant **MASCHERONI's** work, Defendant **ROXBY MASCHERONI** responded, "Let's go back and erase all this."

35.    The day after the resort meeting, Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** that she needed to learn to lie and say that she did not edit his work.

36.     On or about September 1, 2009, Defendant **MASCHERONI** traveled to the Argentine consulate in Houston, Texas.

Communications with banks

37.     On or about September 9, 2009, Defendant **MASCHERONI** spoke on the phone with a representative of a bank in St. Croix about opening an account at the bank.

38.     On or about September 14, 2009, Defendant **MASCHERONI** spoke on the phone with a bank representative in Miami about opening an account at a Swiss bank as an Argentine.  Defendant **MASCHERONI** told the representative that he should have $500,000 in the account by the end of the year.

39.     On or about September 24, 2009, Defendant **MASCHERONI** spoke on the phone with a financial consultant in Argentina about opening a bank account with $400,000 as an Argentine at a bank in Argentina or Uruguay that would not inform the IRS.  On that same day, Defendant **MASCHERONI** told Defendant **ROXBY MASCHERONI** that he had a "great conversation" with a banker in Argentina.  On or about September 28, 2009, Defendant **MASCHERONI** wrote in an email to the financial consultant in Argentina that he would legally change his name if that was necessary to keep the IRS from learning of his account.

OCTOBER 19, 2009, RECOVERY OF DOCUMENTS AND KEY

40.     Documents containing Restricted Data, confirmed by the Department of Energy, were recovered by FBI agents from the **MASCHERONI** residence on October 19, 2009.  Some of the documents were designated with the official classification marking "Secret."  FBI agents

also recovered from the **MASCHERONI** residence the Post Office Box key that Defendant **MASCHERONI** had used in the dead drops.

DEFENDANT ROXBY MASCHERONI'S "MAKE BOMBS FOR ... VENEZUELA" COMMENT

41. On or about March 24, 2008, during a conversation with an individual whose identity is known to the Grand Jury, Defendant **ROXBY MASCHERONI** said, referring to Defendant **MASCHERONI**, "No, he's going to make bombs for Argentina if they don't listen to him in Washington. Oh, not Argentina, I'm sorry, Venezuela."

Count 1

42. The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

43. From on or about October of 2007 through on or about October of 2009, in the District of New Mexico and elsewhere, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI,** lawfully and unlawfully having possession of, access to, control over, and being entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data did knowingly and voluntarily conspire and agree and act interdependently with each other to communicate, transmit, and disclose the same to any individual with the intent to injure the United States and to secure an advantage to any foreign nation.

In violation of 42 U.S.C. §§ 2274(a) and 2014.

<u>Count 2</u>

44.     The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

45.     On or about November 11, 2008, in the District of New Mexico, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI**, lawfully and unlawfully having possession of, access to, control over, and being entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data did communicate, transmit, and disclose the same to an individual with the intent to injure the United States and to secure an advantage to a foreign nation.

In violation of 42 U.S.C. §§ 2274(a) and 2014, and 18 U.S.C. § 2(a).

<u>Count 3</u>

46.     The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

47.     On or about July 14, 2009, in the District of New Mexico, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI**, lawfully and unlawfully having possession of, access to, control over, and being entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data did communicate, transmit, and disclose the same to an individual with the intent to injure the United States and to secure an advantage to a foreign nation.

In violation of 42 U.S.C. §§ 2274(a) and 2014, and 18 U.S.C. § 2(a).

Count 4

48.    The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

49.    From on or about October of 2007 through on or about October of 2009, in the District of New Mexico and elsewhere, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI** did knowingly and voluntarily conspire and agree and act interdependently with each other knowingly, inside the United States, to participate in the development of an atomic weapon, the offense occurring in and affecting interstate and foreign commerce.

In violation of 42 U.S.C. §§ 2122, 2272(b), and 2014.

Count 5

50.    The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

51.    From on or about October of 2007 through on or about October of 2009, in the District of New Mexico and elsewhere, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI** did attempt knowingly, inside the United States, to participate in the development of an atomic weapon, the offense occurring in and affecting interstate and foreign commerce.

In violation of 42 U.S.C. §§ 2122, 2272(b), and 2014, and 18 U.S.C. § 2(a).

Count 6

52.    The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

53.    From on or about October of 2007 through on or about October of 2009, in the District of New Mexico and elsewhere, defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI** did knowingly and voluntarily conspire and agree and act interdependently with each other to commit an offense against the United States, to wit:

> (a) intentionally to convey and sell records and things of value of the United States and a department and agency thereof, and property made under contract for the United States and a department and agency thereof, that is Restricted Data, knowing they were without authority to do so, the aggregate value of the records and things of value exceeding the sum of $1,000, in violation of 18 U.S.C. §§ 641 and 2(a); and

> (b) willfully and knowingly to convert records and things of value of the United States and a department and agency thereof, and property made under contract for the United States and a department and agency thereof, that is Restricted Data, to their own use and the use of another, the aggregate value of the records and things of value exceeding the sum of $1,000, in violation of 18 U.S.C. §§ 641 and 2(a);

and did engage in any of the overt acts alleged in this indictment to effect an object of the conspiracy.

54.    The acts and statements of each of defendants **PEDRO LEONARDO MASCHERONI** and **MARJORIE ROXBY MASCHERONI** set forth in each of paragraphs 11 through 16 and 18 through 39 above each constitute an overt act to effect an object of the

24

conspiracy, and each of those acts and statements is hereby incorporated by reference herein.

In violation of 18 U.S.C. § 371.

<u>Count 7</u>

55. The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

56. On or about November 11, 2008, in the District of New Mexico, defendants **PEDRO LEONARDO MASCHERONI and MARJORIE ROXBY MASCHERONI** did intentionally convey and sell records and things of value of the United States and a department and agency thereof, and property made under contract for the United States and a department and agency thereof, that is Restricted Data, knowing they were without authority to do so, and did willfully and knowingly convert the same to their own use and the use of another. The aggregate value of the records and things of value exceeded the sum of $1,000.

In violation of 18 U.S.C. §§ 641 and 2(a).

<u>Count 8</u>

57. The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

58. On or about July 14, 2009, in the District of New Mexico, defendants **PEDRO LEONARDO MASCHERONI and MARJORIE ROXBY MASCHERONI** did intentionally convey and sell records and things of value of the United States and a department and agency thereof, and property made under contract for the United States and a department and agency thereof, that is Restricted Data, knowing they were without authority to do so, and did willfully and knowingly convert the same to their own use and the use of another. The aggregate value of

the records and things of value exceeded the sum of $1,000.

In violation of 18 U.S.C. §§ 641 and 2(a).

## Count 9

59.     The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

60.     From no earlier than on or about August of 1979 through on or about October 19, 2009, in the District of New Mexico, defendant **PEDRO LEONARDO MASCHERONI** did conceal and retain records and things of value of the United States and a department and agency thereof, and property made under contract for the United States and a department and agency thereof, that is Restricted Data, with the intent to convert the same to his own use and gain, knowing the records and things of value to have been embezzled, stolen, purloined, and converted.   The aggregate value of the records and things of value exceeded the sum of $1,000.

In violation of 18 U.S.C. § 641.

## Counts 10 - 15

61.     The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

62.     On or about October 19, 2009, in the District of New Mexico, defendant **PEDRO LEONARDO MASCHERONI**, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, knowing such statement and representation to be false, fictitious, and fraudulent, to wit:

| COUNT | FALSE STATEMENT/REPRESENTATION |
|---|---|
| 10 | Defendant **MASCHERONI** denied recognizing and having met "Jimenez." |
| 11 | Defendant **MASCHERONI** said he did not write a document he was shown from dead drop #4. |
| 12 | Defendant **MASCHERONI** denied receiving $20,000. |
| 13 | Defendant **MASCHERONI** said he did not still have the key to the Post Office Box that he used in dead drop #1. |
| 14 | Defendant **MASCHERONI** denied that he had any copies of what he had provided to "Jimenez." |
| 15 | Defendant **MASCHERONI** denied that Defendant **ROXBY MASCHERONI** had ever met "Jimenez." |

In violation of 18 U.S.C. § 1001(a)(2).

## Counts 16 - 22

63. The grand jury realleges and incorporates as if fully stated herein paragraphs 1 through 41 above.

64. On or about October 19, 2009, in the District of New Mexico, defendant **MARJORIE ROXBY MASCHERONI**, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, knowing such statement and representation to be false, fictitious, and fraudulent, to wit:

| COUNT | STATEMENT/REPRESENTATION |
|---|---|
| 16 | Defendant **ROXBY MASCHERONI** claimed that she had not edited any of Defendant **MASCHERONI's** work for the past two years, other than communications he sent to Congress or to his doctor. |

| COUNT | STATEMENT/REPRESENTATION |
|-------|--------------------------|
| 17 | Defendant **ROXBY MASCHERONI** claimed that she did not know Defendant **MASCHERONI's** program had anything to do with building bombs or giving anyone a weapons capability. |
| 18 | Defendant **ROXBY MASCHERONI** denied knowing about $20,000 in cash that Defendant **MASCHERONI** had received. |
| 19 | Defendant **ROXBY MASCHERONI** denied that Defendant **MASCHERONI** had ever talked to her about any secret meeting he had. |
| 20 | Defendant **ROXBY MASCHERONI** claimed that Defendant **MASCHERONI** never talked about an offshore account with her. |
| 21 | Defendant **ROXBY MASCHERONI** claimed that Defendant **MASCHERONI** never asked her to attend classified seminars. |
| 22 | Defendant **ROXBY MASCHERONI** denied having ridden with Defendant **MASCHERONI** when any of the envelopes Defendant **MASCHERONI** delivered to the dead drop Post Office Box were in the car. |

In violation of 18 U.S.C. § 1001(a)(2).

A TRUE BILL:

_____

FOREPERSON OF THE GRAND JURY

Assistant United States Attorney

9/14/10 1:06 pm