IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Criminal No. 10-2626 BB

PEDRO LEONARDO MASCHERONI,
also known as Luke, and
MARJORIE ROXBY MASCHERONI,

      Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' OBJECTIONS TO THE GOVERNMENT'S PROPOSED CIPA PROTECTIVE ORDER

On October 19, 2009, FBI agents executed a search warrant at the home of Defendants. The agents seized approximately 200 boxes of material. The prosecution has informed Defendants that approximately 200,000 pages of documentary evidence contained within those boxes has been scanned and will be provided to the Defense only after entry of a CIPA protective order. Notably however, the prosecution does not claim that all, or even that most, of the information and material seized from Defendants' home is classified. Instead, the prosecution has asserted to the defense that some of the material allegedly contains classified information, but because in its estimate the material is too voluminous to submit to a comprehensive classification review, it has decided to treat all of the information as classified. [Doc 171-1, ¶¶ 1, 2(a)(iv)]. Incredibly, the Government also appears to seek Court approval of its claim that it is now the owner of all of the information seized from Defendants' home. [Doc 171-1, ¶¶ 1, 2(a)(iv) and 16]. The problem with the Government's approach is that it is illegal.

The Government has a duty to protect information that is truly classified in the interest of national security.  The Government also has a duty not to suppress information, infringe on its citizens' constitutional rights, or propose procedure that violates applicable law.  A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  As such, the prosecutor "is in a peculiar and very definite sense the servant of the law." *Id.*  "[S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense . . .."" *Jencks v. United States*, 353 U.S. 657, 671 (1957) (quoting *United States v. Reynolds*, 345 U.S. 1, 12 (1953)).

"Our democratic principles require that the American people be informed of the activities of their Government."  Executive Order 13526 issued December 29, 2009 (Classified National Security Information).  Indeed, "our Nation's progress depends on the free flow of information both within the Government and to the American people." *Id.* "Protecting information critical to our Nation's security and demonstrating our commitment to open Government through accurate and accountable application of classification standards and routine, secure, and effective declassification are equally important principles." *Id.*  Inherent within these principles and duties, is the Government's obligation in this case to do its job and to separate classified information from unclassified information so that classified information may be protected, and

unclassified information may be produced in accordance with typical Rule 16 discovery obligations. Only then should CIPA be implicated.

In furtherance of its scheme to treat information and material seized from Defendants as classified, whether or not such information is truly classified, the prosecution has proposed a protective order that defines classified information as *anything it says is classified*. [Doc 171-1, ¶ 2(a)(iv)]. Without disclosing its scheme to the Court,[1] the Government has proposed that the Court find "that good cause exists to protect" and make subject to its CIPA protective order, "information or material" that "is not defined as being 'classified information.'" *Id.* ¶ 1, page 2. This proposed approach ignores the relevant laws, regulations, and executive orders that set forth very specific and rigid criteria for classifying information and clearly define classified information as Restricted Data, Formerly Restricted Data and National Security Information. The prosecution's proposed gross expansion of the limited executive authority to classify privately generated material is particularly repugnant in this case where much of the materials seized from Defendants' home constitutes Dr. Mascheroni's intellectual property created over the more than twenty years since he ceased employment at the Los Alamos National Laboratories, and the Government is seeking a Court declaration that it is now the owner of such material. [Doc 171-1, ¶ 16]. The Government's proposed expansion of CIPA is perhaps most egregious because it is designed to perpetuate the Government's refusal to submit Dr. Mascheroni's documents for classification review in

---

[1] It is unknown whether the Government has submitted an *ex parte* statement to the Court attempting to convince the Court that good cause exists to expand the scope of CIPA to documents that are not classified. Defendants object to any *ex parte* filings and requests that the Court refuse to accept such filings, or if already filed to provide Defendants access to such filing, if the Government has failed to make a particularized showing of exceptional circumstances to justify *ex parte* filings in an adversarial proceeding. To ensure both "the appearance and the reality of fairness," the Court should not permit the government to proceed *ex parte* without an adequate showing. *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd by an equally divided Court*, 484 U.S. 1 (1987).

blatant violation of its promise in securing the search warrant under which those documents were seized.

The Government has possessed the materials seized from Defendants' home for more than two years, but rather than complete the classification review,[2] has indicated that counsel for Defendants should sift through the material in a secured room and submit for classification review whatever the defense thinks is relevant.  In this regard, the prosecution's proposed expansion of CIPA is designed to improperly shift its burden of identifying and marking classified discovery provided to the defense so that it may be properly protected and to instead require the defense to be unnecessarily burdened with the difficulties that CIPA protections entail until it can disprove that the information is classified.  It was not the defense who chose to prosecute this case, and the Court should refuse to allow the prosecution to obstruct the process of this case in the manner it proposes.  The Government's proposed protective order constitutes a perversion of CIPA and as more fully discussed below, would violate numerous of Defendants' constitutional rights if entered by the Court.

In considering the form of protective order that it will enter in this matter, the Court should be mindful of Congress' intent when enacting CIPA.  Specifically, while Congress expected the trial judge "'to fashion creative and fair solutions' for classified information problems, . . .it emphasized that the Court should not undertake to balance the national security interests of the government against the rights of the defendant but rather that in the end remedies and sanctions against the government must be designed to

---

[2] Normally classification reviews should be conducted promptly and determinations made within ninety days of receipt of the information.  See 10 C.F.R. § 1045.15(a);10 C.F.R. § 1045.39; 32 C.F.R. § 2001.14; *cf. U.S. v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972)(opining that maximum period for classification review after the submission of material for publication by former CIA employee should not exceed thirty days and anything more would cause undue delay and therefore be unreasonable).

make the defendant whole again." *United States v. Poindexter*, 698 F.Supp. 316, 320

(D.D.C. 1988) (relying on 1980 U.S.Code Cong. & Admin.News 4294, 4301-4303).

"Thus while a limited opportunity for creative judicial adjustment of CIPA procedures

exists, in the end, defendant's constitutional rights must control." *Poindexter, id.* at 320.

To that end, the Defense has carefully prepared and proposed a modified CIPA § 3

protective order, attached as Exhibit B to Defendants' objections to the Government's

proposed protective order filed herewith, which, unlike the Government's proposed order

comports with CIPA and the applicable regulations. *See* 18 U.S.C. App. III §3.

I.      CIPA FRAMEWORK

        The Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III was

designed to provide a mechanism in criminal cases that involve *classified information*

which would provide the Government sufficient information at an early stage to decide

whether or not the possible harm to national security created by a defendant's need to

disclose *classified information* outweighs the benefit to the public interest derived from

prosecution of criminal charges. *See U.S. v. Poindexter*, 698 F.Supp. 316 (D.D.C. 1988);

*United States v. Wilson*, 571 F.Supp. 1422, 1426 (S.D.N.Y.1983) (CIPA "was designed

to establish procedures to harmonize a defendant's right to obtain and present exculpatory

material upon his trial and the government's right to protect classified material in the

national interest.") With CIPA Congress established a series of procedures for

determining pretrial the use, relevance, and admissibility of *classified information* that

the defense intends to use. *See id., United States v. Lee*, 90 F.Supp.2d 1324 (D.N.M.

2000). CIPA applies to both *classified* testimony and *classified* documents. *See United

States v. North*, 708 F.Supp. 399, 399–400 (D.C.C. 1988).

Cases involving classified information place unique demands on the defense. For instance the defense attorneys must work outside of their regular offices in a secure room or sensitive compartmented information facility (SCIF). A defendant seeking to use classified documents or information at trial "is required under a literal application of CIPA to reveal his defense before the trial starts and is confronted with other related obstacles and disadvantages." *Poindexter*, 698 F.Supp at 316. However, such revelation is only necessary as to classified documents and testimony because CIPA expressly **does not** apply to non-classified or declassified material or information. *See* 18 U.S.C. App. III § 1.  In enacting CIPA Congress declared that the defendant "should not stand in a worse position, because of the fact that classified information is involved, than he would without this Act." *See* S. Rep. No. 96-823, at 9, reprinted in 1980 U.S. Code Cong. & Ad. News 4294, 4302; see *United States v. Lopez-Lima,* 738 F. Supp. 1404, 1407 (S.D. Fla. 1990) (same); *United States v. North,* 698 F. Supp. 316, 320 (D.D.C. 1988) (same).

CIPA establishes several pretrial procedures "to adjust the competing interests of the Government in maintaining its secrets and of the defendant in mounting an effective defense." *United States v. Pappas*, 94 F.3d 795, 709 (2nd Cir. 1996). Initially, Section 3 provides that, on the Government's motion, the court must issue a protective order to guard against the disclosure of any classified information "disclosed by the United States to any defendant in any criminal case." 18 U.S.C. App III, § 3.  Thus, by its terms, a protective order may only extend to classified information obtained by the defense from the United States. *Id., see also Pappas, id.*

Then, section 5 requires the defense to provide notice to the Government and the court of an intent to disclose classified information "in connection with any trial or

pretrial proceeding." 18 U.S.C. App. III, § 5.  Section 5 further provides that a defendant

shall not disclose classified information "in connection with a trial or pretrial proceeding"

until the required notice has been given and the Government has had a reasonable

opportunity to invoke the protections available under section 6.  *Id.* Classified

information that the defense reasonably expects to disclose but does <u>not</u> list on the section

5 Notice may be precluded form use at trial.  *Id.* §5(b); *Poindexter*, 698 F.Supp. at 318

("Until a specific item of classified information is properly noticed, defendants are

prohibited from disclosing that information during trial or pretrial proceedings.").

Finally, subsection 6(a) authorizes the prosecution to request, and obliges the

court to make a pretrial determination as to the "use, relevance, or admissibility" of

classified information listed in the defendant's CIPA section 5 notice that would

otherwise be determined at trial. 18 U.S.C. App. III, § 6(a).  At the request of the

Attorney General the hearing must be held in secret.  When determining the use,

relevance and admissibility of the proposed evidence, the court may not take into account

that the evidence is classified; relevance of classified information in a given case is

governed solely by the standards set forth in the Federal Rules of Evidence. *See Lee*, 90

F.Supp.2d 1324, FN 2 (citing *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1364

(11th Cir.1994)); *Poindexter,* 698 F.Supp. at 318 (CIPA "does not alter the existing

standards for determining relevance or admissibility.").   Following the hearing, the

district court must "set forth in writing" the basis for its ruling as to each item of

classified information at issue in the hearing. 18 U.S.C. App. III §6(a).

As to any information for which the district court authorizes disclosure, the

prosecution may apply for a court order under section 6(c) to avoid such disclosure either

by admitting relevant facts that the information to be disclosed would tend to prove or by

providing the defendant with a substitute summary of such information. 18 U.S.C. App.

3, §6(c). On the other hand if the court denies the Government's subsection 6(c)

application, "the court shall order that the defendant not disclose" such information, and

whenever a defendant is prohibited from disclosure by a subsection 6(e)(1) order, the

court shall dismiss the charges, or, where such action would not serve the interests of

justice, take alternative, remedial steps.  18 U.S.C. App. 3, § 6(e)(1) and (2).

"CIPA thus contemplates three circumstances in which a defendant may be

prohibited from disclosing classified information." *Pappas*, 94 F.3d at 709. The first

circumstance where Defendants are restrained from disclosing information is following

the Court's issuance of a section 3 CIPA protective order.  *See id.* at 800. The second

circumstance arises during the pendency of a Government application for a section 6

pretrial ruling and remedy. *See id.* at 709. The third circumstance is following the Court's

ruling that the Government may not use alternatives in lieu of disclosure and must

therefore accept dismissal (or some lesser remedy) as the price of resisting disclosure. *See*

*id.*

II.     THE GOVERNMENT'S PROTECTIVE ORDER PROPOSES JUDICIAL
        LEGISLATION IN VIOLATION OF SEPARATION OF POWERS.

A.      **Doctrine of Separation of Powers**

Separation of powers is one of the foundations of our federalist system of

government. "The Constitution [seeks] to divide the delegated powers of the . . . Federal

Government into three defined categories, Legislative, Executive, and Judicial." *Bowsher*

*v. Synar*, 478 U.S. 714, 721 (1986). The Supreme Court has given both voice and

importance to this doctrine. *See Mistretta v. United States*, 488 U.S. 361, 380

(1989)("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."); *Bowsher*, 478 U.S. at 722; *I.N.S. v. Chadha*, 462 U.S. 919, 951-52 (1983)("The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."). "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). "[T]he doctrine of separated powers serves to eliminate arrangements that threaten to permit one branch either to aggrandize its power or to encroach on functions reserved for another branch." *United States v. Hilario*, 218 F.3d 19, 26 (1st Cir. 2000) (citing *Mistretta*, 488 U.S. at 381-82 (1989)).

"The Federal Judiciary was ... designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982). The separation of powers doctrine "preserves an independent and neutral judiciary, relatively removed from the decisions and activities of the other two branches." *In re*

*Sealed Cases*, 838 F.2d 476, 512 (D.C.Cir.1988). "Discharging tasks other than the deciding of cases and controversies would 'involve the judges too intimately in the process of policy and thereby weaken confidence in the disinterestedness of their judicatory functions.'" *Id.* (quoting F. Frankfurter, Advisory Opinions, 1 Encyclopedia of the Social Sciences 475, 478 (1930)). The Supreme Court has expressed "vigilance" against the danger "that the Judicial Branch neither be assigned nor allowed tasks that are more properly accomplished by [other] branches." *Mistretta*, 488 U.S. at 383 (internal citations and quotations omitted).

2.     **Congress has spoken on the definition of classified information within CIPA's purview and the Government's proposed Court ordered expansion of CIPA violates the separation of powers doctrine.**

The Government proposes expansion of the definition of classified information to not only include information that has actually been classified under applicable statutes, regulations and Executive Orders, but also "any information or material that the Defense has been notified orally or in writing is to be treated as containing Classified Information subject to a classification review." [Doc. 171-1, ¶ 2(a)(iv)]. The Government has informed the defense orally that it intends to treat all 200 boxes of material seized from Defendants' home as classified, and that classification review will only be done at the Defendants' request as to particular items. The Government also suggests to the Court without elaboration that it find "good cause" to protect as classified, information or material "not defined by CIPA as being "classified information.'" [Doc. 171-1, ¶ 1]. This approach is improper and unsupported by the law. Adoption of this expanded definition by the Court in the form of entry of the Government's proposed protective order, would

constitute judicial legislation in direct contravention of Congressional law and in violation of separation of powers.

CIPA defines "Classified Information" as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security and any restricted date, as defined in . . . the Atomic Energy Act of 1954." 18 U.S.C. App. III, §1.  There are three categories of information that if classified will fall within CIPA's definition of Classified Information in this case.  These categories are (1) Restricted Data (RD), (2) Formerly Restricted Data (FRD), and (3) National Security Information (NSI).  The Atomic Energy Act of 1954 identifies the first two categories whereas the third category is founded in Executive Order 13526. RD is defined as "all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy," but shall not include FRD or data declassified."  42 U.S.C § 2014(y).  FRD is defined as "classified information jointly determined by DOE and DoD to be related primarily to the military utilization of nuclear weapons and removed "by transclassification) from the RD category."  10 C.F.R. § 1045.3, 42 U.S.C. § 2162.  NSI is information that "is owned by, produced by or for, or is under the control of the United States Government", (EO 13526 Part 1 § 1.1(2)), whose "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security", and which pertains one or more of the following:

(a)     military plans, weapons systems, or operations;
(b)     foreign government information;
(c)     intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(d)     foreign relations or foreign activities of the Unite States, including confidential sources

(e)     scientific, technological, or economic matters relating to the national security;

(f)     United States Government programs for safeguarding nuclear materials or facilities;

(g)     vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to the national security; or

(h)     the development, production, or use of weapons of mass destruction.

EO 13526 Part 1§ 1.4.  RD, FRD and NSI are not in themselves classification categories. Rather, they are categories of information that may be classified at one of the three classification levels of "Top Secret", "Secret" or "Confidential."  10 C.F.R. § 1045.3; EO 13526 Part 1, § 1.2. By its terms, CIPA only applies to classified information.  Thus, RD, FRD or NSI that is declassified or never was classified in the first place, is not subject to CIPA procedures.

The law is clear that classification of RD, FRD, or NSI cannot be done for improper purposes including to (1) conceal violations of law, inefficiency, or administrative error, (2) prevent embarrassment to a person, organization or agency,  (3) restrain competition, or (4) prevent or delay the release of information that does not require protection for national security or nonproliferation reasons.  10 C.F.R. § 1045.13, EO 13526 Part 1, § 1.7.  Nor shall RD or FRD be classified in order to "[u]nduly restrict dissemination by assigning an improper classification level."  10 C.F.R. § 1045.13.  The Government's request to have the Court adopt a definition of "Classified Information" to include at least 200,000 pages of documents taken from Defendants' home, some or all of which are unclassified and after two years of administrative inefficiency, still have not been submitted for classification review, appears to implicate some, if not all, of these classification prohibitions.  The Court should decline to adopt a definition of classified

information that allows the Government to dictate arbitrarily what material will be subject to CIPA and which effectively "delays the release of information that does not require protection for national security or nonproliferation reasons" and "[u]nduly restrict[s] dissemination" to the defense "by assigning an improper classification level." 10 C.F.R. § 1045.13.

There is absolutely no legal or proper basis for the Government's proposed expansion of the definition of Classified Information in this case.  Entry of the Government's proposed order would constitute judicial law-making and encroach on legislative functions.  If Congress had wanted CIPA to apply so broadly, it would have said so.  Congress did not say so, and nor should the Court.  The Government's motion should be denied.

**3.      Court adoption of the Government's proposed expansion of the criminal laws regarding mishandling or dissemination of classified information to punish acts of negligence would also violate the separation of powers doctrine.**

Under paragraph 15 of the Government's protective order, the Government appears to propose that the Court impose contempt and criminal liability for the "negligent handling or unauthorized disclosure or retention of Classified Information." However, Congress has enacted a number of criminal statutes punishing the unauthorized dissemination of certain types of classified information, and there is neither need nor authority for the Court to create new, unenforceable criminal negligence standards.  The criminal statutes punishing misuse or unauthorized communication of classified information all demand a willful, knowing, and/or intentional misuse.  For instance, under 42 U.S.C. 2274, a person must communicate, transmit or disclose restricted data "with intent to injure the United States or with intent to secure an advantage to any

foreign nation" or "with reason to believe such data will be utilized to injure the United States" before criminal liability may attach.  Similarly, regarding national security or defense information, a person must have intent or reason to believe that the information is to be used to the injury of the United States and must willfully mishandle or communicate such information before possible criminal liability may attach. *See* 18 U.S.C. § 793; *see also*, e. g., 18 U.S.C. § 798, which imposes a prison term of 10 years and a $10,000 fine for knowingly and willfully publishing certain types of classified information, and 18 U.S.C. § 794, which makes it a criminal offense punishable by life in prison to communicate national defense information to a foreign government.

The Court should decline the Government's attempt to create criminal liability under its protective order for negligent acts where Congress has not seen fit to do so.  Not only would such a provision be unenforceable, its entry would constitute a violation of separation of powers.   The parties are well aware of the statutory prohibitions set forth above and of the possible contempt consequences of failing to abide any of this Court's orders.  The Court should refuse to enter an order that unconstitutionally subjects Defendants and their counsel to criminal prosecution for negligent acts especially in light of the fact that the Government's proposed protective order as a whole is overflowing with ambiguity and vagueness.  The entry of such a provision would not only violate Defendants' constitutional rights, but also the constitutional rights of their counsel, and as such, would interfere with and ultimately violate Defendants' constitutional rights to counsel and to a fair trial.

III.    THE GOVERNMENT'S PROPOSED TREATMENT OF PUBLIC DOMAIN INFORMATION AND ATTEMPT TO FOREVER PROHIBIT DEFENSE COMMENT UPON THE EXISTENCE, ACCURACY, CLASSIFICATION OR TECHNICAL MERIT OF ANY CLASSIFIED INFORMATION THAT IS

PUBLICLY AVAILABLE OR IN OPEN SOURCES IMPERMISSIBLY
EXTENDS THE REACH OF SECTION 3.

The Government has proposed language in its requested protective order

restraining the Defendants from using, confirming or commenting upon the existence,

accuracy, classification, or technical merit of any RD, FRD or other Classified

Information found by the Defense in the public domain. [Doc 171-1, ¶ 4].  However,

CIPA explicitly limits the scope of a section 3 protective order to prohibit a defendant's

disclosure of "classified information disclosed by the United States to any defendant in

any criminal case."  18 U.S.C. App. 3, § 3.  The legislative history of CIPA makes it clear

exactly how Congress intended section 3's disclosure prohibitions to apply.  See *United

States v. Pappas*, 94 F.3d 795, 800 (2nd Cir. 1996).  The Senate Report, discussing a

section 3 protective order, declares:

> If the defendant already had classified materials in his possession, such a
> protective order can prevent disclosure in connection with the trial but it cannot
> be expected to reach disclosure outside the trials. Federal criminal statutes apply
> to such disclosures.

Senate Report at 6, reprinted in 1980 U.S.C.C.A.N. at 4299, quoted in *Pappas, id.* "Thus,

though the Senate Report understood that a section 3 protective order can apply to the

defendant's previously acquired information, the order may prohibit disclosure only 'in

connection with the trial' and not outside the trial." *Pappas, id*.

> The understanding of the relevant committees of the House of Representatives is
> even more emphatic. The most detailed House report is that of the Permanent
> Select Committee on Intelligence. *See* H.R.Rep. No. 831, 96th Cong., 2d Sess., pt.
> 1 (1980) (" House Report "). The House Report considered first the prohibition on
> disclosure following the defendant's notice of intent to disclose. . . . The House
> Report states:

> The Committee wishes to emphasize that neither the language of section
> 102(a)(1) concerning the prohibition on disclosure (nor the court order provisions
> of sections 102(d) and 105(a)) are in any way intended to be the basis for any

proposed expansion or reinterpretation of the law of prior restraint, and section 102(a)(1) is not, in fact, intended to be a prior restraint provision at all.... The intent is to leave the law of prior restraint undisturbed. It has been held that the trial court has broad discretion in prohibiting disclosure by the defendant of information obtained by the defendant through use of the court's processes, such as through discovery. A prohibition in this area can extend to out-of-court disclosures and to post-trial disclosures. The court's authority is narrowed where the information at issue *was in the possession of the defendant before the trial began and was not obtained by the defendant with the aid of the court*. In this area, the court's authority to prohibit disclosure extends only to a regulation of what may be said or introduced in the trial context.

House Report at 13-14 (footnote omitted). Then the House Report discussed the prohibition on disclosure that follows a court's rejection of a Government request for alternative procedures to avoid disclosure. This provision, which became section 6(e) of CIPA, was section 105(a) of H.R. 4736. The House Report emphasized:

As the discussion accompanying section 102(a) notes, generally, such order may only extend to disclosure in connection with the trial if it pertains to classified information not obtained by the defendant through the court's processes.

House Report at 21 n. 17.

Finally, the House Report discussed the scope of the protective order authorized by section 109(a) of H.R. 4736, which became section 3 of CIPA:

Section 109(a) directs the court, upon motion of the government, to issue an order for the protection against unauthorized disclosure of classified information disclosed by the government to the defendant. The provision is intended to codify the well established practice, based on the inherent authority of federal courts, to issue protective orders. Such orders are usually associated with the discovery process. Subsection (a) makes it clear that protective orders are to be issued, if requested, whenever the government discloses classified information to a defendant in connection with a prosecution, e.g., Brady and Jencks material. House Report at 26.

*Pappas, id.* at 800-801. In short, "the scope of CIPA prohibitions on a defendant's

disclosure of classified information may be summarized as follows: information

conveyed by the Government to the defendant in the course of pretrial discovery or the

presentation of the Government's case may be prohibited from disclosure, including

public disclosure outside the courtroom, but information acquired by the defendant prior

to the criminal prosecution may be prohibited from disclosure only 'in connection with the trial' and not outside the trial."  *Id.* at 801.

"[I]nformation in the public domain would normally not be subject to a restraint on disclosure." *Pappas*, 94 F.3d at 802 (citing *United States v. Snepp*, 444 U.S. 507, 513 n. 8 (1980) (assuming that neither the CIA nor foreign agents would be concerned with disclosure of information already in the public domain)); *United States v. Marchetti*, 466 F.2d 1309, 1319 (4th Cir.), cert. denied, 409 U.S. 1063 (1972) (opining where classified information may have been publicly disclosed, ex-CIA agent "should have as much right as anyone else to republish it.").  Where the Defense in this case has obtained RD, FRD, or NSI information in the public domain, through its own efforts, or through sources other than the United States in connection with this case, it should not be restrained from utilizing such relevant information as it sees fit.  This is particularly true where the information has been obtained or was known to the defense prior to the exchange of classified discovery.

Moreover, it is unreasonable to expect that the defense would know whether information it has obtained in the public domain is classified or not.  Defendants do not possess any inside information that would cause them to assume or enable them to determine that anything in the public domain is classified -- Dr. Mascheroni has not possessed a security clearance for over twenty years!  It would certainly be reasonable for the Defense to assume, like the Supreme Court Justices in *Snepp* and the Fourth Circuit in *Marchetti*, that information in the public domain is unclassified and need not be protected.   In any event, CIPA does not prohibit public disclosures of the entire universe of classified information.  Rather, it only prescribes specific procedures for protecting

information known to the defense to be classified through the Government's disclosures.

Thus, other than Government provided classified public domain information made in

discovery, no other public domain information, whether classified or not, should fall

under CIPA protections.

The Government bears the responsibility for protecting classified information.

Thus, if it wishes to restrain the Defense's disclosure in trial or pretrial commentary and

use of public domain information, it should also bear the burden of communicating the

classified nature of that information to the Defense.  The Defense has proposed a

practical and reasonable solution to dealing with the public domain category of classified

information in its proposed modifications to the Government's proposed CIPA protective

order.  The Court should summarily reject the Government's proposed public source

provision.

IV.    THE GOVERNMENT'S PROPOSED CIPA PROTECTIVE ORDER
       INFRINGES ON DEFENDANTS' COMMON LAW AND CONSTITUTIONAL
       RIGHTS TO OPEN PROCEEDINGS AND A PUBLIC TRIAL

The Government's proposed protective order infringes on Defendants' rights to

open proceedings and a public trial in at least two respects.  First, as more fully discussed

in Defendants' objections to the Government's proposed protective order, the

Government seeks to require the defense to file all pleadings under seal subject to a

classification review whether or not such pleadings even touch upon substantive, much

less classified matters.  Second, the Government's quest for case seclusion apparently

motivates its attempted expansion of CIPA procedures to cover all material taken from

Defendants' home and any other material it arbitrarily says should be treated as

classified, whether such material in actuality is classified or not. The Court will recall that

18

the Government incredibly sought to have this response filed outside of public view even though the defense has not yet been provided with access to any classified material.

There is a long-standing common-law presumption of public access to judicial records. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *see also In re Boston Herald, Inc.*, 321 F.3d 174, 189 (1st Cir. 2003) (noting that Supreme Court has also "recognized a qualified First Amendment right of access to certain judicial proceedings and documents.").  This presumption of public access "helps safeguard the integrity, quality, and respect in our judicial system, and permits the public to keep a watchful eye on the workings of public agencies." *In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2nd Cir. 1994) (internal quotation marks and citations omitted); *see also In re Gitto Global Corp.*, 422 F.3d 1, 6 (1st Cir. 2005). "The importance of public access to the proper functioning of our judicial system cannot be overstated." *Globe Newspaper Co. v. Fenton*, 819 F.Supp. 89, 94 (D.Mass., 1993) (opining on the importance of public review of judicial proceedings as reflected in Justice Brandies' observation that for the judicial system as other human enterprises, "'[s]unlight is said to be the best of disinfectants; electric light the most efficient policeman.'" (Quoting L. Brandeis, Other People's Money 62 (Nat'l Home Lib. Found. ed. 1933)). "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 380 (1979).  "Every court has supervisory power over its own records and files," *Nixon*, 435 U.S. at 598, but "[o]nly the most compelling

reasons can justify non-disclosure of judicial records." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (internal quotation marks omitted).

Careful public scrutiny of the Court is especially important in connection with criminal proceedings.  Indeed, "[o]ne of the demands of a democratic society is that the public should know what goes on in courts . . . to the end that the public may judge whether our system of criminal justice is fair and right." *Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 920 (1950). "[T]he criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991).

The right to a public trial, "'has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *Gannett,* 443 U.S. at 383 (quoting In re Oliver, 333 U.S. 257, 270). The public trial guarantee

> 'is for the protection of all persons accused of crime—the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial—that one rule [as to public trials] must be observed and applied to all.' . . . 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . .'

*Id.* (quoting *In re Oliver* 333 U.S. at 270 n. 25) (internal citations and quotations omitted).

In light of these importation constitutional and common-law rights in openness of the criminal proceedings, and considering the fact that CIPA already imposes significant secrecy burdens as to truly classified matters, the Court should refuse the Government's invitation to impose even greater burdens on Defendants' rights by enacting judicial legislation that expands CIPA's secrecy protections well beyond the limits contemplated by Congress.   In other words, the Court should not entertain a protective order that broadens the definition of classified information to include anything that the Government arbitrarily chooses to label as such.

V.    THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER IS UNCONSTITUTIONALLY VAGUE, OVERBROAD AND AN IMPERMISSIBLE PRIOR RESTRAINT ON THE FIRST AMENDMENT RIGHTS OF THE DEFENSE.

The Government's proposed protective order amounts to a prior restraint on the First Amendment free speech rights of Defendants and their counsel.  The First Amendment imposes strict limits on the availability of any judicial order that has the effect of restricting expression.  The unclassified discovery material that constitutes twenty years worth of intellectual work of Dr. Mascheroni falls within the class of "protected speech," for which First Amendment protection is afforded.  *See United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) *cert. denied*, 409 U.S. 1063 (stating that a secrecy oath purporting to prevent disclosure of unclassified information would be in contravention of First Amendment rights); *cf Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (It is "clear that information obtained through civil discovery authorized by modern rules of civil procedure would rarely, if ever, fall within the classes of unprotected speech identified by decisions of this Court."); *Oklahoma Hosp. Ass'n v. Oklahoma Pub. Co.*, 748 F.2d 1421, 1424 (10th Cir. 1984) ("it may be conceded that

21

parties to litigation have a constitutionally protected right to disseminate information obtained by them through the discovery process absent a valid protective order"). Similarly, comment and discussion about information contained within the public domain is protected by First Amendment guarantees. *See Pappas*, 94 F.3d at 802 ("[I]nformation in the public domain would normally not be subject to a restraint on disclosure."); *United States v. Marchetti*, 466 F.2d 1309, 1319 (4th Cir.), cert. denied, 409 U.S. 1063 (1972) (opining where classified information may have been publicly disclosed, ex-CIA agent "should have as much right as anyone else to republish it.").

While parties to litigation do not have "an unrestrained right to disseminate information," *Seattle Times Co.*, 467 U.S. at 32, "[a]ny prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976) (quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418-420 (1971)).   The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Nebraska Press Ass'n., id.* "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).   The Government's proposed protective order is not narrowly drawn and its restraint on public domain information and unclassified information taken from Defendants' home is not justified by any compelling societal needs. *Seattle Times Co.*, 467 U.S. at 32 (citations omitted) (mentioning *In re Halkin*, 194 U.S.App.D.C. 257, 598 F.2d 176, 191 (1979) (Characterizing protective order as

"paradigmatic prior restraint" requiring close scrutiny, court also held that before a protective order that restricts expression should issue, court must be satisfied that "the harm posed by dissemination must be substantial and serious; the restraining order must be narrowly drawn and precise; and there must be no alternative means of protecting the public interest which intrudes less directly on expression.")); *cf. United States v. McVeigh*, 119 F.3d 806, 814 (10th Cir.1997) (judicial documents are presumptively available to the public, but may be sealed if the right to access is outweighed by the interests favoring nondisclosure, and "district court made adequate findings to support its [sealing] orders, and that it narrowly tailored those orders to the compelling interests at stake").

        The Government's proposed protective order is also unconstitutionally vague and overbroad in a number of respects.  First, it does not set boundaries for sufficiently apprising the defense of what information is classified, and instead imposes a burden on the defense to guess what information within the public domain could be classified.  The Government's proposed order also contains a provision for penalizing the defense for negligent violation of its terms but fails to specifically identify its terms.  The Government's proposed order when viewed as a whole is both ambiguous and confusing as to exactly what material is protected and what it prohibits with regard to that material, and thus risks arbitrary enforcement.  *See generally United States v. Brice*, 926 F.2d 925, 930 (9th Cir.1991).  In short, the order is unconstitutionally vague because it does not satisfy the requirement of "certainty required by the Constitution" because its language does not convey "sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices." *Turf Center, Inc. v. United States*, 325 F.2d 793, 795 (9th Cir.1963); *see Grayned v. Rockford*, 408 U.S. 104, 108 (1972).

The Government's failure to clearly identify guidelines for what constitutes classified information and to clearly identify all prohibited acts also renders it unconstitutionally overly broad.  Regulations that delegate "standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights" are constitutionally overbroad.  *Broadrick v. Oklahoma*, 413 U.S. at 613.  The Government's proposed protective order does just that.  It delegates to an unnamed entity, presumably the prosecution in conjunction with an executive agency, the discretion to include anything it wants to include within the definition of classified information.  Then, it apparently prohibits the defense from possessing outside the secured area or commenting on any classified public domain information, but does not set forth procedures for notifying the defense of what is classified within the public domain. Either the Government expects the defense to develop psychic powers to enable it to determine what in the public domain is classified, or perhaps the Government expects the defense to assume the entire universe of information in the public domain to be classified and subject to the CIPA order's protections.  Whatever the case may be, proposing that a criminal negligence standard apply under these ambiguous provisions, unequivocally renders the Government's proposed CIPA order unconstitutionally overbroad.  *See id.*.

The Defense has proposed a protective order that it believes takes into consideration the Government's concerns while confining the provisions to permissible application.  *Broadrick*, 413 U.S. at 613 ("facial overbreadth has not been invoked when a limiting construction has been or could be placed" on the challenged law.)  Specifically,

the protective order proposed by the defense properly accommodates the Government's need to preserve the confidentiality of truly classified information and material, while not abridging the free flow of unclassified information or the Defendants' ability to present a defense as is their right. *See Marchetti*, 466 F.2d at 1317 ("The public interest lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information."). If the Government is serious about the consequences of disclosure, surely it should not have a problem identifying classified public domain information that it deems worthy of protection here, as proposed by Defendants' proffered modification.  For all of these reasons, the Court should reject the Government's proposed protective order and adopt Defendants' proposed modifications.

VI.    TO THE EXTENT THAT THE GOVERNMENT'S PROPOSED EXPANSION OF CIPA WOULD SUBJECT UNCLASSIFIED DISCOVERY TO CIPA'S NOTICE REQUIREMENTS, SECTION 5 AND 6 OF CIPA WOULD BE RENDERED UNCONSTITUTIONAL AS APPLIED.

If the Court were to adopt the approach offered by the prosecution in this case and define classified information as anything the government says it is including unclassified materials seized from Defendants' home, the defendants would presumably be required to follow section 5 and 6 of CIPA as to the prosecution defined "classified information." Such an impermissible expansion of CIPA would violate Defendants' Fifth and Sixth Amendment rights as applied in this case because it would require the Defendants to provide pretrial notice as to the bulk of material in discovery if Defendants reasonably expect to disclose that information, whether it is *actually* classified or not, and to explain the "use, relevance, [and] admissibility" of such information at a pretrial hearing.

While courts have rejected the arguments that CIPA's broad, compelled pretrial disclosure of defense evidence and strategy violate their Fifth and Sixth Amendment rights,[3] those cases dealt with a proper application of CIPA to truly classified material.  In the present case, the prosecution seeks to control virtually every aspect of Defendants' defense by enshrouding more than 20 years of Defendants' knowledge, information and Dr. Mascheroni's intellectual material in its overly broad definition of *classified information*.  In contrast to other CIPA cases, in this case the prosecution would not only have a preview of Defendants' classified defense including their potential trial testimony, cross-examination of witnesses, and use of exhibits, it would have a preview of Defendants' unclassified defense and be permitted to launch challenges thereto.  Under these circumstances, Defendants would invariably be compelled to testify at a CIPA 6 hearing to explain the relevance, use and admissibility of unclassified information within the universe of material and knowledge that the supports Defendants' defenses and which the prosecution intends to treat as classified.  The prosecution should not be permitted to interfere so massively in the unclassified portion of Defendants' defense and the expansion of CIPA to allow such interference where unclassified material is at issue would render CIPA unconstitutional as applied.

Defendants' constitutional right to remain silent unless and until they decide to testify will be *infringed* if the Court authorizes CIPA sections 5 and 6 notice and explanation requirements to apply to the 200 boxes of discovery and the entire universe

---

[3] *See e.g., United States v. Collins*, 720 F.2d 1195, 1200 (11th Cir. 1983); *United States v. Wilson*, 721 F.2d 967, 976 (4th Cir.1983); *United States v. Drake*,__ F.Supp.2d ___, 2011 WL 1405379 (D.Md. April 13, 2011); *United States v. Bin Laden*, 2001 U.S. Dist. Lexis 719 (S.D.N.Y. Jan. 25, 2001); *United States v. Lee*, 90 F.Supp. 2d 1322224 (D.N.M. 2000); *United States v. Ivy*, 1993 U.S. Dist. LEXIS 13572 (E.D. Pa., Aug 12, 1993); *United States v. Poindexter*, 725 F.Supp. 13 (D.D.C. 1989); *United States v. North*, 708 F. Supp. 399 (D.D.C. 1989).

of Defendants' knowledge contained therein whether really classified or not. Indeed, because section 5 commands that Defendants give notice of *classified information* that they expect to disclose "in any manner" and prohibits disclosure of "any" *classified information* until notice has been given, or risk preclusion, under the prosecution's proposed definition of classified information Defendants would have to give notice of everything within their knowledge including information gained from public sources. To the extent that the expansion of CIPA proposed by the Government would ultimately compel Defendants to testify at a section 6 hearing to explain the admissibility, use and relevance of the universe of their knowledge and information to keep open the option of testifying about prosecution defined "classified information" or risk preclusion, CIPA as applied, would violate Defendants' Fifth Amendment right to remain silent **without penalty.**

In *Brooks v. Tennessee*, 406 U.S. 605 (1972), the Supreme Court struck down a Tennessee statute that required the defendant to testify as the first defense witness or not at all. The Court recognized that the statute "reflect[s] a state interest in preventing testimonial influence," but declared that "[p]ressuring the defendant to take the stand, by foreclosing later testimony if he refuses, is not a constitutionally permissible means of ensuring his honesty." *Id.* at 611. The Court held that the statute "violates an accused's constitutional right to remain silent insofar as it requires him to testify first for the defense or not at all." *Id.* at 612.

*Brooks* rests upon the fundamental proposition that the Fifth Amendment guarantees the defendant's right "to **remain silent** unless he chooses to speak in the unfettered exercise of his own will, **and to suffer no penalty . . . for such silence.**'" Id..

at 609 (quoting *Malloy v. Hogan*, 373 U.S. 1, 8 (1964)) (emphasis added). The Tennessee

statute at issue in *Brooks* violated this basic rule because it "exacted[ed] a price for [the

defendant's] silence by keeping him off the stand entirely unless he [chose] to testify

first." *Id.* at 610.  Thus, the Court concluded, the statute "'cut[] down on the privilege [to

remain silent] by making its assertion costly.'" *Id.* at 611 (quoting *Griffin v. California*,

380 U.S. 609, 614 (1965)).

     *Brooks* held the Tennessee statute unconstitutional because it penalized the

defendant's **silence** at the beginning of the defense case by prohibiting him from

testifying later.  "[T]he Tennessee rule imposed a penalty for petitioner's **initial silence**,

and that penalty constitutes the infringement of the [Fifth Amendment] right." Id. at 611

n.6 (emphasis added).  As applied to this case CIPA §§ 5 and 6 contain the identical

defect: those provisions if applied to the prosecution's proposed expansive definition of

classified material to include the universe of Defendant's material and information as

well as public domain information will operate to penalize the defendants for remaining

silent, instead of making the pretrial disclosures and explanations that they demand, by

prohibiting him from testifying at trial.  *Brooks* makes clear that Defendants cannot be

penalized in this manner for standing on their Fifth Amendment rights and refusing to

make pretrial disclosures and explanations of admissibility and relevance of their own

testimony.[4]

---

[4] In United States v. Poindexter, 725 F. Supp. 13 (D.D.C 1989), rev'd on other
grounds, 951 F.2d 369 (D.C. Cir. 1991), the district court declined to hold CIPA § 5
unconstitutional under Brooks because § 5 does not compel the defendant "to reveal as to
when he will testify, or even whether he will testify." Id. at 33.  But this misses the point
of Brooks.  That case holds that the defendant cannot be penalized for his pre-testimony
silence through preclusion of his testimony at trial.  See Brooks, 406 U.S. at 610-12.
CIPA §§ 5 and 6 have precisely that forbidden effect.  The district court in Poindexter did
not address this aspect of Brooks.  Moreover, Poindexter did not address the requirement
under CIPA § 6 that the defense explain the "use, relevance, [and] admissibility" of the
defendant's proposed classified testimony pretrial.

VII.   ISSUANCE OF THE PROSECUTION'S PROPOSED PROTECTIVE ORDER
WOULD CONSTITUTE COURT ENDORSEMENT OF THE GOVERNMENT'S
ATTEMPTED ILLEGAL TAKING OF PRIVATE PROPERTY IN VIOLATION OF
THE FIFTH AMENDMENT TO THE CONSTITUTION

       The Government appears to be attempting through its proposed protective order to

forfeit the approximately 200 boxes of documents seized from the Defendants' home,

which on information and belief, contain Dr. Mascheroni's non-classified intellectual

work product generated over the more than twenty year period since he ceased his

employment at LANL as well as open source documents including letters to Congress,

copies of internet files, and journal articles within the public domain.  Dr. Mascheroni has

a constitutionally protected property interest in those documents including in his

intellectual property seized from his home office.  The Government cannot use a section

3 protective order to appropriate Dr. Mascheroni's property interests by way of the

protective order it has requested.

       While it is well settled that preventing harm to a person's economic interests is an

appropriate purpose of a protective order, a protective order should never be used as a

back-door mechanism to harm a person's economic interests.  *See e.g., E.I. du Pont de*

*Nemours Powder Co. v. Masland*, 244 U.S. 100, 102-03 (1917) (where "it is or should

become necessary to reveal [trade] secrets to others it will rest in the judge's discretion to

determine whether, to whom, and under what precautions, the revelation should be

made").  In this case, Dr. Mascheroni has a financial interest in lawfully disseminating

his unclassified proprietary materials, previously in his possession, in any manner he sees

fit after the trial of this matter.  If Dr. Mascheroni intends to lawfully publish his

unclassified theories, or reignite interest within Congress concerning those theories, he is

entitled to do so, "free from fear of expropriation." *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 555 (1985) (citation omitted).  If Dr. Mascheroni intends at some point in the future to lawfully sell his unclassified work product materials, he is entitled to the proceeds of such sale, not the Government.  Had the Government not confiscated approximately 200 boxes of unclassified documents from Dr. Mascheroni which contain over twenty years of his scientific work product, the choice of dissemination of his property would have remained Dr. Mascheroni's.  Dr. Mascheroni should not stand to forever lose control over and his proprietary interest in his work product materials simply because the Government wishes it to be so in this case.  Until and unless the Government initiates and successfully, lawfully forfeits these materials, they remain the property of Dr. Mascheroni.  *See generally*, 18 U.S.C. § 981.

VI.   APPLICABLE REGULATIONS CREATE AN ENTITLEMENT TO DUE
      PROCESS PROTECTIONS REGARDING ANY CLASSIFICATION
      DECISIONS THAT AFFECT THESE INTERESTS

The Department of Energy and other Executive agencies' classification and declassification discretion is not completely unfettered as the prosecution in this case appears to believe.  There are standards which govern and restrict executive determinations regarding the classification and declassification of materials.  *See* 10 C.F.R. 1045.1 et seq., Executive Order 13526, 32 C.F.R. 2001.1 et seq., DOE O 475.2A (Approved February 1, 2011), PL 105-261, § 3161, PL 106-65, § 3149, PL 106-398, § 3193, ISOO Notice 2011-02.  The regulatory schemes create an expectancy that information will not be originally classified or remain classified unless specified requirements are met.  Mandatory language regarding classification procedures that Executive branch agencies must follow creates a presumption against classification of

privately generated information except for very narrow circumstances.  In the present case these schemes protect Dr. Mascheroni's property interests and ensure procedural and substantive due process protections.

The Due Process Clause of the Fifth Amendment provides that an individual shall not be "deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The Supreme Court has noted that the contours of this constitutional provision "guarantee more than fair process and ... cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal citation and quotations omitted). In *Lewis*, the Supreme Court explained that

> [s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action.... We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.

*Id.* at 845-46, 118 S.Ct. 1708 (internal quotations and citations omitted). Procedural due process refers to the Constitutional requirement that deprivation of life, liberty or property must occur in a fair manner. *See Salerno*, 481 U.S. at 746. The amount of process required is not rigidly defined.  "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). A two-step analysis governs procedural due process claims. *See Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir.2006) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Dr. Mascheroni unquestionably has a constitutionally protected property interest in the documents seized from his home. If the Court is at all inclined to permit the Government to treat as classified RD or FRD any information that appears in the public domain or privately authored documents seized from Dr. Mascheroni's home and therefore subject to CIPA protections, the Defense should first be permitted a hearing wherein the DOE is required to demonstrate absolute compliance with the Code of Federal Regulations in arriving at such classification decisions.  Specifically, regarding such allegedly classified information, the Court should conduct a hearing in which it considers all of the pertinent regulations including, without limitation:

(1) Whether the Director of Classification has identified and described the undue risk of damage to the common defense and security from the unauthorized disclosure of the subject RD or FRD. 10 C.F.R. 1045.16(a).

(2) Whether there is significant doubt about the need to classify the information and therefore the declassification of such information is warranted.  10 C.F.R. 1045.16(b).

(3) Whether the Director of Classification and the Chief Health, Safety and Security Officer has considered the presumptions set forth in 10 C.F.R. 1045.15(d) and (e)[5]. 10 C.F.R. 1045.16(c).

---

[5]    a.    Information in the following areas is presumed to be unclassified unless application of the criteria in 10 C.F.R. § 1045.16 indicate otherwise:

(1) Basic Science: mathematics, chemistry, theoretical and experimental physics, engineering, materials science, biology and medicine;

(2)    Magnetic confinement fusion technology;

(3)    Civilian power reactors, including nuclear fuel cycle information but excluding technologies for uranium enrichment;

(4) Source materials (defined as uranium and thorium and ores containing them);

(5) Fact of use of safety features (e.g., insensitive high explosives, fire resistant pits) to lower the risks and reduce the consequences of nuclear weapon accidents;

(6) Generic weapons effects;

(7) Physical and chemical properties of uranium and plutonium, most of their alloys and compounds, under standard temperature and pressure conditions;

(4)	Whether in making a classification or declassification decision, the Director of classification and the Chief Health, Safety and Security Officer have given due consideration to:

(i)  Whether the information is so widely known or readily apparent to knowledgeable observers that its classification would cast doubt on the credibility of the classification system;

(ii) Whether publication of the information would assist in the development of countermeasures or otherwise jeopardize any U.S. weapon or weapon system;

(iii) Whether the information would hinder U.S. nonproliferation efforts by significantly assisting potential adversaries to develop or improve a nuclear weapon capability, produce nuclear weapons materials, or make other military use of nuclear energy;

---

(8) Nuclear fuel reprocessing technology and reactor products not revealing classified production rates or inventories;

(9) The fact, time, location, and yield range (e.g., less than 20 kilotons or 20-150 kilotons) of U.S. nuclear tests;

(10) General descriptions of nuclear material production processes and theory of operation;

(11) DOE special nuclear material aggregate inventories and production rates not revealing size or details concerning the nuclear weapons stockpile;

(12) Types of waste products resulting from all DOE weapon and material production operations;

(13) Any information solely relating to the public and worker health and safety or to environmental quality; and

(14) The simple association or simple presence of any material (i.e., element, compound, isotope, alloy, etc.) at a specified DOE site.

b. Information in the following areas is presumed classified unless the application of the criteria in 10 C.R.F. § 1045.16 indicates otherwise:

(1) Detailed designs, specifications, and functional descriptions of nuclear explosives, whether in the active stockpile or retired;

(2) Material properties under conditions achieved in nuclear explosions that are principally useful only for design and analysis of nuclear weapons;

(3) Vulnerabilities of U.S. nuclear weapons to sabotage, countermeasures, or unauthorized use;

(4) Nuclear weapons logistics and operational performance information (e.g., specific weapon deployments, yields, capabilities), related to military utilization of those weapons required by the DoD;

(5) Details of the critical steps or components in nuclear material production processes; and

(6) Features of military nuclear reactors, especially naval nuclear propulsion reactors, that are not common to or required for civilian power reactors.

10 C.F.R. § 1045.15(d) and (e).

(iv) Whether publication of the information would have a detrimental effect on U.S. foreign relations;

(v) Whether publication of the information would benefit the public welfare, taking into account the importance of the information to public discussion and education and potential contribution to economic growth; and, 6) Whether publication of the information would benefit the operation of any Government program by reducing operating costs or improving public acceptance. 10 C.F.R. 1045.16(d).

(5)      Whether in the case of newly generated specific information in a previously declassified subject area such information has only been classified by the Director of Classification as RD if warranted using the criteria set forth above where such information has not been "widely disseminated in the public domain." 10 C.F.R. 1045.18

(6)      Whether the Director of Classification and the Chief Health, Safety and Security Officer is able to justify a classification or declassification determination concerning RD or FRD.  10 C.F.R. § 1045.19(a).

(7)      Whether for FRD and RD primarily related to military utilization, the Director of Classification and the Chief Health, Safety and Security Officer have coordinated the determination and justification with the Department of Defense. 10 C.F.R. § 1045.19(a).

(8)      Whether in the case of a classification or declassification determination concerning RD or FRD information that involves a departure from the presumptions in 10 C.F.R. § 1045.15, the justification shall include a rationale for the departure and whether the Director of Classification and the Chief Health, Safety and Security Officer have ensured that a separate justification has been prepared which is publicly releasable and available to any person upon request to the Director of Classification. 10 C.F.R. 1045.19(a).

Similarly, in the case of classified National Security Information, if the Court permits the Government to dictate orally or in writing that it will treat information and material as classified subject to a classification review, the Court should require that the Classification review be completed immediately but no later than thirty days from now, and then hold a hearing to determine whether the particular agency has complied with the requirements of EO 13529 and 32 C.F.R. § 2000.1 et seq..

IX.    THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER VIOLATES DUE
PROCESS AND THE EIGHTH AMENDMENT PROHIBITION AGAINST
EXCESSIVE BAIL.

The proposed protective order's mandate that Defendants' compliance with its

terms constitutes a new condition of their pretrial release violates Defendants' Fifth

Amendment right to due process of law and the Eighth Amendment prohibition against

Excessive Bail.  The Eighth Amendment provides that "[e]xcessive bail shall not be

required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.

Const. Amend. VIII.  To find a violation of the Excessive Bail Clause, a court must find

that the release conditions are excessive "in light of the perceived evil." *United States v.*

*Salerno*, 481 U.S. 739, 754 (1987).  Although the explicit text of the Eighth Amendment

appears to address the amount of bail fixed, no court has so limited the reach of this

provision. None have held that the clause does not apply to conditions of release.  In

*Salerno*, 481 U.S. 739, 751 (1987) for instance, the issue was not the amount of bail, but

the detention.  *See also United States v. Merritt*, 612 F.Supp.2d 1074, 1080 (D.Neb.2009)

(finding unconstitutional the Adam Walsh amendments to the Bail Reform Act imposing

separate and additional conditions of release on persons charged with certain offenses);

*United States v. Vujnovich*, 2008 U.S. Dist. LEXIS 20677 (D.  Kan. 2008) (same); *United*

*States v. Torres*, 566 F.Supp.2d 591 (W.D. Tex. 2008) (same); *United States v.*

*Arzberger*, 2008 U.S. Dist. LEXIS 106499 (S.D.N.Y. December 31, 2008) (same).

The government may detain an arrestee "to ensure his presence at trial," *Bell v.*

*Wolfish*, 441 U.S. 520, 536 (1979), and may impose some conditions, such as reasonable

bail, before releasing him, *Salerno*, 481 U.S. at 754.  However bail and conditions of

release must be "reasonably calculated to fulfill" the government's purpose. *Stack v.*

*Boyle*, 342 U.S. 1, 5 (1951); *Galen v. County of Los Angeles*, 477 F.3d 652, 659-660 (9th Cir.2007) (bail may not be set to achieve invalid interests or in an amount that is excessive in relation to the interests sought to be protected). "The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions-such as chopping off a finger or giving up one's first-born. Once a state decides to release a criminal defendant pending trial, the state may impose only such conditions as are constitutional, including compliance with the prohibition against excessive bail." *United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) (Unconstitutional conditions doctrine limits government's ability to exact waivers of rights as condition of benefits, even when those benefits are fully discretionary.)

A liberty interest may be created by legislation or regulations that impose substantive restrictions on government's discretion to deprive an individual of certain freedoms.  *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) ("[A] State creates a protected liberty interest by placing substantive limitations on official discretion."); *McQuillion v. Duncan*, 306 F.3d 895, 901-03 (9th Cir.2002) (finding liberty interest in parole regulations containing mandatory language); Riley v. Greene, 149 F.Supp.2d 1256 (D.Colo.2001) (analyzing whether administrative regulations promulgated for INS creates liberty interest).  The "fundamental requisite of due process of law is the opportunity to be heard." *Goldberg v. Kelley*, 397 U.S. 254, 263 (1970).  This right applies no matter what the balance between the interests of the Government and the Defendants -- in this case assuring community safety, appearing for trial and not being detained prior to trial.  *See United States v. Crowell*, 2006 WL 3541735 (W.D.N.Y. Dec. 7, 2006) (legislative desire to suppress the potential to continue misconduct by persons

while on release pending trial does not allow Congress to override fundamental constitutional safeguards of the accused).  The Supreme Court recognized the right to be heard regarding the Bail Reform Act in *United States v. Salerno*, 481 U.S. 739, 751 (1987).

Pursuant to the Bail Reform Act of 1984, when a person charged with a federal crime appears before the court, the judge or magistrate judge must "order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court ... unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C.A. § 3142(b). The government bears the burden of proving the defendant is a flight risk or poses a risk of harm such that the defendant should not be released or, if he or she is to be released pending trial, the release must be subject to conditions. *United States v. Kisling*, 334 F.3d 734 (8th Cir.2003).

The Defendants have both been released in accordance with the Bail Reform Act under conditions which satisfied the releasing Judge that they pose neither a flight risk nor a danger to the community, and the Government and the Court cannot now, more than a year into their release in this matter, impose new restraints on their liberty that conditions their continued release on compliance with the Government's overly broad and otherwise constitutionally infirm proposed protective order.  This proposal is especially problematic where the Government's protective order is fraught with vagueness problems, attempts to expand CIPA far beyond the limits for which it was enacted, and attempts to fashion a new criminal negligence standard applicable to the

37

parties to the order.  Moreover, this provision is absolutely unnecessary because the

Defendants' conditions of release require that they not commit any new law violations.

Defendants will not have access to classified material provided by the Government to the

defense in connection with this case except for in the presence of undersigned counsel.

Defendants are well aware that they are prohibited from disclosing classified information

learned in the course of this case and have no intention of violating the criminal laws

proscribing specified conduct with regard to the unauthorized dissemination of classified

information. Despite the charges against them, Defendants continue to enjoy the

presumption of innocence and imposition of a new condition of release more than a year

after the Court released them pending trial violates Defendants' Fifth and Eighth

Amendment rights.

CONCLUSION

The Government's desire to suppress the potential that classified information is

negligently exposed does not allow it, or the Court, to override fundamental

constitutional rights enjoyed by the defendants.  It should be immediately apparent that

the Government's proposed approach to CIPA is unworkable in this case, inconsistent

with the law, and constitutionally infirm.  It would be impossible to conduct this case

under the precise strictures of CIPA where the Government has failed to identify what

documents actually are classified and instead intends to dump over 200,000 pages of

documents, most of which are likely unclassified, on the defense and demand strict CIPA

compliance.  Congress made clear in enacting CIPA that in any case involving classified

information the defendant should not stand in a worse position because of such

information than he would have if there were no such statutory procedures.  With this

important directive in mind, the Court should not hesitate to decline entry of the

Government's overly broad protective order.  The Government cannot defend the

constitutionality of many of the provisions set forth in its proposed protective order and

the Court should reject it.

Respectfully Submitted,


/s/
Robert R. Cooper
1011 Lomas Blvd. NW
Albuquerque, NM 87102
(505) 842-8494


/s/ Kirtan Khalsa
Kirtan Khalsa
812 Marquette Ave. NW
Albuquerque, NM 87102
(505) 604-3322

/s/
Erlinda O. Johnson
1011 Lomas Blvd. NW
Albuquerque, NM 87102
(505) 792-4048

/s/
Robert Jason Bowles
201 3rd St. NW #1370
Albuquerque, NM 87102
(505) 217-2680


I hereby certify that a copy of this pleading
was transmitted via CMECF to all parties
entitled to notice on this 10th day of
November, 2011.

/s/ Kirtan Khalsa
Kirtan Khalsa