FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 2 1 2013

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 10-2626 WPJ |
| | ) | |
| **PEDRO LEONARDO MASCHERONI,** | ) | |
| also known as "Luke," | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT

Pursuant to Federal Rule of Criminal Procedure 11, the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, **PEDRO LEONARDO MASCHERONI**, and the Defendant's counsel, Robert Cooper, Esq., Kirtan Khalsa, Esq., and Richard Winterbottom, Esq.:

## REPRESENTATION BY COUNSEL

1.      The Defendant understands the Defendant's right to be represented by an attorney and is so represented. The Defendant has thoroughly reviewed all aspects of this case with the Defendant's attorneys and is fully satisfied with his attorneys' legal representation.

## RIGHTS OF THE DEFENDANT

2.      The Defendant further understands the Defendant's rights:

      a.      to be prosecuted by indictment on all charges;

     b.    to plead not guilty, or having already so pleaded, to persist in that plea;

     c.    to have a trial by jury; and

     d.    at a trial:

        i.   to confront and cross-examine adverse witnesses,

        ii.  to be protected from compelled self-incrimination,

        iii.  to testify and present evidence on the Defendant's own behalf, and

        iv.  to compel the attendance of witnesses for the defense.

3.    The Defendant agrees to waive these rights and to plead guilty to Counts 7, 8, and 10 through 15 of the Indictment filed in this case charging a violation of 18 U.S.C. § 641, conveyance and conversion of government property (and as to Counts 7 and 8, 18 U.S.C. § 2(a), aiding and abetting); and 18 U.S.C. § 1001(a)(2), false, fictitious, or fraudulent statement or representation. The Defendant also agrees to waive these rights and to plead guilty to Counts 1 through 3 of an Information that will be filed at his change of plea hearing charging a violation of 42 U.S.C. §§ 2274(b) and 2014, 18 U.S.C. § 2(a), communication of Restricted Data and aiding and abetting; and 18 U.S.C. § 793(e), retention of national defense information.

## SENTENCING

4.    The Defendant understands that the maximum penalty the Court can impose as to each count of the Indictment and Information to which he is pleading guilty is:

For each of Counts 7 and 8 of the Indictment (18 U.S.C. §§ 641 and 2(a)), Counts 1 and 2 of the Information (42 U.S.C. §§ 2274(b) and 2014, 18 U.S.C. § 2(a)), and Count 3 of the Information (18 U.S.C. § 793(e)):

     a.    imprisonment for a period of not more than 10 years;

   b.  a fine not to exceed the greater of $250,000 or twice the pecuniary gain to the Defendant or pecuniary loss to the victim;

   c.  a mandatory term of supervised release of not more than three years that must follow any term of imprisonment. (If the Defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the Defendant's supervised release could be revoked -- even on the last day of the term -- and the Defendant could then be returned to another period of incarceration and a new term of supervised release.);

   d.  a mandatory special penalty assessment of $100.00; and

   e.  restitution as may be ordered by the Court.

For each of Counts 10-15 of the Indictment (18 U.S.C. § 1001(a)(2)):

   f.  imprisonment for a period of not more than five years;

   g.  a fine not to exceed the greater of $250,000 or twice the pecuniary gain to the Defendant or pecuniary loss to the victim;

   h.  a mandatory term of supervised release of not more than three years that must follow any term of imprisonment. (If the Defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the Defendant's supervised release could be revoked -- even on the last day of the term -- and the Defendant could then be returned to another period of incarceration and a new term of supervised release.);

   i.  a mandatory special penalty assessment of $100.00; and

   j.  restitution as may be ordered by the Court.

  5.  The parties are entering into this plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The parties are aware that the Court may accept or reject this

plea agreement, and may defer its decision as to acceptance or rejection until the Court has had an opportunity to consider the presentence report. The parties agree that, while the Court may defer its decision as to acceptance of this plea agreement, the Court should accept the Defendant's guilty pleas at the plea hearing in this matter. Pursuant to Federal Rule of Criminal Procedure 11(c)(5), if the Court rejects this plea agreement, the Defendant shall have the right to withdraw his guilty pleas.

6.     The United States reserves the right to make known to the Court, and to the United States Pretrial Services and Probation Office for inclusion in the presentence report to be prepared under Federal Rule of Criminal Procedure 32, any information the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under U.S.S.G. § 1B1.3. The Defendant also acknowledges that the United States may make known to the public any information the United States deems appropriate.

<b><u>DEFENDANT'S ADMISSION OF FACTS</u></b>

7.     By my signature on this plea agreement, I, Pedro Leonardo Mascheroni, am acknowledging that I am pleading guilty because I am, in fact, guilty of the offenses to which I am pleading guilty. I recognize that my conduct was criminal. Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering each of these guilty pleas, the United States could prove beyond a reasonable doubt facts sufficient to establish my guilt of the offenses to which I am pleading guilty. I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

4

a.      With respect to the charges contained in Counts 1 and 2 of the Information to which I am pleading guilty, on both November 11, 2008, and July 14, 2009, in the District of New Mexico, I violated 42 U.S.C. §§ 2274(b) and 2014. More specifically, on both of those dates, I had possession of, access to, control over, and I had been previously entrusted with, documents, writings, and information involving and incorporating Restricted Data. On both of those dates, I knowingly communicated, transmitted, and disclosed that Restricted Data to another individual. At the time I communicated, transmitted, and disclosed that Restricted Data, I did so with reason to believe that such data would be utilized to secure an advantage to a foreign nation, specifically Venezuela, and to assist in the development of the pulsed hydrogen fluoride laser in the United States.

b.      With respect to the charges contained in Counts 7 and 8 of the Indictment to which I am pleading guilty, on both November 11, 2008, and July 14, 2009, in the District of New Mexico, I violated 18 U.S.C. §§ 641 and 2(a). More specifically, on both of those dates, I knowingly and willfully converted to my own use, and the use of another, classified U.S. Department of Energy ("DOE") records, information, and other things of value, and knowing I was without authority to do so I intentionally conveyed and sold classified DOE records, information, and other things of value, that had an aggregate value in excess of $1,000.

c.      With respect to the charge contained in Count 3 of the Information to which I am pleading guilty, from no earlier than August of 1979, through October 19, 2009, in the District of New Mexico, I violated 18 U.S.C. § 793(e) in that I, having unauthorized possession of, access to, and control over documents, writings, sketches, plans, and notes relating to the national defense, did willfully retain the same and fail to deliver them to an officer or

5

employee of the United States who was entitled to receive them. Specifically, I had unauthorized possession of, and willfully retained in my home, classified documents relating to the national defense that collectively amounted to a few "banker's" boxes worth of material, including the equivalent of boxes of classified documents that were clearly designated and officially marked as SECRET. Some of these SECRET documents contained Restricted Data. I failed to deliver these documents relating to the national defense to the appropriate authorities because I wanted to deliver them to a Congressional Committee Hearing on funding the Laboratory Micro Fusion, Inc. proposal. The Federal Bureau of Investigation ("FBI") recovered all of this classified information relating to the national defense from my home on October 19, 2009, more than 20 years after my employment at Los Alamos National Laboratory ("LANL") had ended.

    d.  With respect to the charges contained in Counts 10 through 15 of the Indictment to which I am pleading guilty, and Count 4 of the Information to which I am pleading guilty, on October 19, 2009, in the District of New Mexico, I violated 18 U.S.C. § 1001(a)(2) in that I, in a matter within the jurisdiction of the FBI, an agency within the Executive Branch of the United States, did knowingly and willfully make several materially false, fictitious, and fraudulent statements and representations. The specific false statements that I acknowledge making to the FBI agents who interviewed me on October 19, 2009, are catalogued in paragraph jj. below, and are hereby incorporated into this paragraph by reference.

    Additionally, with respect to all of the Counts to which I am pleading guilty, I admit the following:

6

e.    I resided in Los Alamos, New Mexico during the relevant time period. I

am a naturalized United States citizen, having been born in Argentina. My father was from Italy.

In 1968, I earned a Ph.D. in physics from the University of California, Berkeley, which is one of

the top physics programs in the United States. From on or about August of 1979 until on or

about March 16, 1988, I worked at LANL. For the majority of my career at LANL (from 1979

until April of 1987) I was hired to work in the Inertial Confinement Fusion ("ICF") group,

known as X-1, and its predecessor as a Staff Member scientist. The X Division is composed of

several groups, X-1 is one of them. LANL is one of the United States' three nuclear weapons

laboratories. As a United States Department of Energy (or its predecessor, the United States

Energy Research and Development Administration) laboratory, LANL performs sensitive

national security missions, including helping to ensure that the United States' nuclear weapons

stockpile is safe, secure, and reliable. I know that since June 1, 2006, Los Alamos National

Security LLC has served as the management and operations contractor for LANL, succeeding the

University of California. LANL is located within the District of New Mexico.

f.    As a scientist who worked within the X Division, I possess expertise in

matters related to the national security of the United States, including ICF and Code Validation

Physics.

g.    During the time I worked in the X Division, I held a security clearance, or

"Q" clearance. I first obtained my "Q" clearance in 1979, which I held continuously through

September of 1987, shortly before I left the X Division. During the time that I had a "Q"

clearance, I could access certain classified information, including Restricted Data, relating to ICF

and nuclear weapons. The goal of the ICF program is to achieve fusion ignition using powerful

7

laser beams. ICF has a variety of applications and I was exposed to classified information, including Restricted Data, as a result of my work in the ICF program. My employment with LANL ended on March 16, 1988.

<u>My statements regarding non-disclosure of classified information in connection with my security clearance</u>

h.　　　　On June 1, 1979, in connection with getting my "Q" clearance at LANL, I signed a statement wherein I acknowledged, among other things, that I was restricted from distributing classified information, including Restricted Data, which I learned during my employment at LANL. During my employment at LANL and continuing even after I was no longer employed at LANL, I signed several additional statements in connection with my security clearance or access authorization similar to the statement I signed on June 1, 1979, including on July 14, 1987, September 28, 1987, March 31, 1988, October 20, 1989, and February 8, 1991, wherein I repeatedly acknowledged that I was not free to share classified information and that penalties attached to unauthorized disclosures. I also acknowledged that classified information is the property of the United States government. I understand that I am still bound by the above-referenced agreements and will continue to be so bound in the future.

i.　　　　When I left the X Division, I was directed to return any classified documents, files, or any other DOE and LANL property that I possessed.

j.　　　　I know that classified information, including Restricted Data, does not lose its status as classified information by virtue of such information appearing on the internet or in some other publicly available source. I also know that, in order for Restricted Data to be declassified, the appropriate government agency must first take steps affirmatively to declassify

8

it. I had never been informed that the United States government had declassified the still-classified Restricted Data that I communicated, transmitted, and disclosed on November 11, 2008, and July 14, 2009.

<u>My visit to the Venezuelan embassy and my communications with an undercover FBI agent who I thought was a representative of the government of Venezuela</u>

k.	In the fall of 2007, I visited the Venezuelan embassy in Washington, D.C. I made the visit of my own free will, searching for funding for my program. I both personally met the receptionist and emailed embassy personnel at the Venezuelan embassy. I informed the embassy personnel, among other things, that I worked at LANL for many years, and that I was interested in working for Venezuela, and I asked for a meeting in the United States.

<u>March 29-31, 2008 phone calls and meetings</u>

l.	Subsequent to my visit to the Venezuelan embassy, I communicated by telephone and email, and had meetings, with an individual who I believed was an intelligence officer for Venezuela. The individual told me his name was "Luis Jimenez." I now know that "Jimenez" was an undercover FBI agent and that the FBI recorded our conversations and meetings. I first met with "Jimenez" on March 30, 2008, and March 31, 2008, in Santa Fe, New Mexico. I told "Jimenez" that our meetings had to be in absolute confidence and were classified. During those meetings, I also told "Jimenez" about my background as a scientist at LANL. I told him about a program that I wanted to develop for Venezuela. I explained how I could use my background and knowledge as a former LANL scientist to develop the program. I also told "Jimenez" that in our future communications he should address me as "Luke." I set up the email

account "Luke0735@aol.com" to communicate with "Jimenez" and I used that account whenever I sent an email to "Jimenez" or received an email from him.

m.      Following the March 31, 2008, meeting, and continuing through October, 2009, "Jimenez" and I communicated via telephone, email (utilizing my "Luke0735@aol.com" account), another face-to-face meeting, and by leaving material for each other to retrieve at a specified location ("dead drops"). Our communications traveled in and affected, and our meetings occurred in and affected, interstate commerce.

May 23, 2008 dead drop

n.      On May 23, 2008, I delivered an envelope that contained a compact disk to a Post Office Box in Albuquerque, New Mexico for "Jimenez" to pick up ("dead drop #1").

o.      I now know that the FBI had obtained the Post Office Box that I used for dead drop #1 and that the FBI covertly monitored me during the dead drop. "Jimenez" had mailed to me the key to the Post Office Box and we had agreed to the details of dead drop #1 in an exchange of emails prior to my delivery of the information. The envelope that I delivered was addressed to "Jimenez" and the "from" section of the envelope contained the name "Luke."

p.      My wife, co-defendant Marjorie Roxby Mascheroni, accompanied me to and from dead drop #1.

November 11, 2008 dead drop

q.      On July 23, 2008, "Jimenez" sent me an email which "Jimenez" addressed to "Luke0735@aol.com" in which "Jimenez" provided me with a list of approximately 12 questions about the program I had described to "Jimenez" during our earlier meetings. The questions were purportedly from Venezuelan military and scientific personnel.

10

r.	I worked on the answers to the 12 questions for close to four months. On November 11, 2008, I delivered to the same Post Office Box where dead drop #1 had occurred an envelope that contained a compact disk for "Jimenez" to pick up ("dead drop #2"). The envelope was addressed to "Jimenez." On the disk was a document that I had written and that my wife had partially edited, which included, among other things, my answers to the questions I received on July 23, 2008, with a cover page that read, "A Deterrence Program for VA by Luke November 11, 2008." I had encoded the approximately 132-page document. "VA" was the code I used with "Jimenez" to stand for the word "Venezuela." I now know that the FBI covertly monitored me during dead drop #2. DOE has confirmed that the document and information I provided included Restricted Data, classified at the Secret Restricted Data ("SRD") and Confidential Restricted Data ("CRD") levels.

s.	The document I delivered in dead drop #2 was written and/or edited using a laptop computer that LANL had assigned to my wife.

t.	My wife drove me to and from dead drop #2.

u.	On November 13, 2008, I used the "Luke0735@aol.com" email account that I set up to communicate with "Jimenez," to email to "Jimenez" the "key" to decipher the code I used in the document I had entitled "A Deterrence Program for VA." The code was of the search and replace variety.

v.	In the document that I provided to "Jimenez," I stated that the information I provided to Venezuela was worth millions of dollars. I quoted a fee of $793,000 for producing the document because I worked on the document for 396.5 hours between July 27, 2008, and

11

November 11, 2008, at a rate of $2,000 per hour; $396,500 was due upon receipt of the document by Venezuela and $396,500 was due after a review meeting with Venezuela.

June 28, 2009 dead drop

w.    During a phone conversation that I had with my wife on May 7, 2009, my wife and I discussed changing a word in an email I was going to send to "Jimenez."

x.    On June 28, 2009, I retrieved from the same Post Office Box where dead drops ##1 and 2 had occurred, a list of approximately 21 questions that were purportedly from Venezuelan military and scientific personnel, as well as an envelope that contained $20,000 in $100 bills ("dead drop #3"). Accompanying the questions and cash was a cover letter from "Jimenez" that explained that the $20,000 was the first installment payment on the fee I had charged for preparing my November 11, 2008, document. The letter, questions, and envelope containing cash were in a large envelope marked "Luke." The FBI retrieved the same envelope containing the same $20,000 cash from my home on October 19, 2009. I now know that the FBI was covertly monitoring me during dead drop #3.

y.    My wife accompanied me to, and drove me from, the Post Office for dead drop #3.

July 14, 2009 dead drop

z.    On July 8, 2009, I used my "Luke0735@aol.com" account and sent an email to "Jimenez" wherein I informed him that I would deliver my answers to the questions I had received to the Post Office Box on July 14, 2009, between 2:00 p.m. and 3:00 p.m.

aa.    On July 14, 2009, at approximately 2:15 p.m., I left an envelope that contained a compact disk in the Post Office Box for "Jimenez" to pick up from the same location

as the prior dead drops ("dead drop #4"). I now know that the FBI covertly monitored me during dead drop #4. In the corner of the envelope was written "Luke," and towards the center of the envelope was written "Jimenez." On the disk was a document wherein I answered the questions I had retrieved in dead drop #3. That document, a portion of which my wife had reviewed and edited, consisted of approximately 39 pages and provided additional Restricted Data to Venezuela that I had reason to believe would be utilized to secure an advantage to Venezuela. DOE has confirmed that the document and information I provided included Restricted Data. A letter I had written to "Jimenez" and Venezuelan officials, a portion of which my wife had reviewed and edited, was also on the disk. I had again encoded both my letter and my answers, using the same code I had used in my November 11, 2008, document.

bb.    In some of my July 14, 2009, answers, I stated that the information I had provided to what I believed was the Venezuelan government was classified and that the source of the information was my knowledge which I learned while I was working at LANL and classified and other discussions with former colleagues. I also answered that I was the only source from which Venezuela could obtain accurate and reliable information about a specific classified program on which I had worked while at LANL and about which I had provided information to "Jimenez" and what I believed was the Venezuelan government.

July 20, 2009 dead drop

cc.    On July 20, 2009, I retrieved from the same Post Office Box that was used for the previous dead drops an envelope addressed to "Luke" that contained a bank statement and a cover letter addressed to "Luke" ("dead drop #5"). In the cover letter, "Jimenez" informed me that the bank statement, which was from a bank in St. Croix, U.S. Virgin Islands and reflected an

13

account balance of $435,255.25, represented another installment payment of the fee I had charged for preparing my November 11, 2008, document. "Jimenez" informed me that he was waiting for me to provide him with my overseas bank account information so that transfers of the money to me could begin. I now know that the FBI covertly monitored me during dead drop #5.

     dd.    After I picked my wife up from the airport on July 20, 2009, she accompanied me to and from the site of dead drop #5.

August 15, 2009 meeting

     ee.    On August 15, 2009, I met "Jimenez" at a resort in New Mexico ("resort meeting"). During that meeting, I again discussed my program for Venezuela. I also answered questions that "Jimenez" told me were part of the process for me to obtain a Venezuelan security clearance so that I could meet with Venezuelan officials in Venezuela. My wife, who had planned to be in Idaho from August 13, 2009, until August 19, 2009, changed her plans and joined the meeting for approximately one hour. I now know the FBI recorded the resort meeting in both audio and video.

     ff.    As set forth above, during the resort meeting, I told "Jimenez" that I had traveled to the Venezuelan embassy in Washington, D.C. in late September of 2007, and spoke with and emailed embassy personnel, informing them that I was a nuclear physicist who used to work at LANL and that I was interested in helping Venezuela.

     gg.    During the resort meeting, I told "Jimenez" that I was going to go to the Argentine consulate in Houston, Texas on September 1, 2009, to obtain an Argentine passport.

## September 1, 2009 travel to Argentine consulate

hh.     On September 1, 2009, I traveled to the Argentine consulate in Houston, Texas for the purpose of obtaining an Argentine passport. At that time, I took the first steps necessary for obtaining an Argentine passport, which I was going to use to open the overseas bank account into which Venezuela would deposit the fee I charged for preparing my November 11, 2008, document. However, I never obtained the passport.

## October 19, 2009 recovery of items and interview

ii.     On October 19, 2009, FBI agents obtained from my home classified documents confirmed by DOE to contain classified Restricted Data. Some of the documents were designated with the official classification marking "SECRET." I possessed these documents without authorization from LANL and retained them in my home. Some of the classified documents in my home contained the Restricted Data that I provided to "Jimenez."

jj.     Also on October 19, 2009, I was interviewed by FBI agents. I lied to the agents and my lies were materially false, as described above. The agents even warned me that lying to them would violate 18 U.S.C. § 1001 but I lied to them anyway. The false statements and representations that I made to the FBI agents include the following:

> i.     when I was shown a picture of "Jimenez" with whom I had been communicating and meeting since March of 2008, I lied and denied recognizing or ever having met him, which I later corrected;

15

ii. when I was shown a document from dead drop #4 that I had written, I lied and said that I did not write the document, which I later corrected;

iii. when I was asked whether I had received $20,000, I lied and said that I had not received $20,000 even though I received an envelope with $20,000 from "Jimenez;" I later corrected this lie;

iv. when asked if I still had the key to the Post Office Box that I used in dead drop #1, I lied and said that I did not still have it;

v. I lied when I denied having any copies of what I had provided to "Jimenez;" and

vi. I lied when I denied that my wife had ever met "Jimenez;" I failed to correct this lie because I forgot.

8. By signing this agreement, the Defendant admits that there is a factual basis for each element of the crimes to which the Defendant is pleading guilty. The Defendant agrees that the Court may rely on any of these facts.

## STIPULATIONS

9. The United States and the Defendant stipulate as follows:

a. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties stipulate that the appropriate disposition of this case is as follows:

i. as to each of Counts 7 and 8 of the Indictment and Counts 1 through 3 of the Information to which the Defendant is pleading guilty, the Defendant shall be sentenced to the custody of the

16

Bureau of Prisons for a term of not less than 24 months nor more than 66 months, such terms to run concurrent with each other;

ii.  as to each of Counts 10 through 15 of the Indictment to which the Defendant is pleading guilty, the Defendant shall be sentenced to the custody of the Bureau of Prisons for a term of not less than 24 months nor more than 60 months, such terms to run concurrent with each other and concurrent with the terms imposed for Counts 7 and 8 of the Indictment and Counts 1 through 3 of the Information;

iii. following service of all of the Defendant's terms of imprisonment, the Defendant shall be placed on supervised release for a term of one year as to each Count to which he is pleading guilty. All terms of supervised release shall run consecutive to each other, with the exception of the term of supervised release for Count 8, which shall run concurrent with the term of supervised release for Count 7. Thus, the Defendant will be on supervised release for a period of 10 years. Provided that the Court finds that the Defendant satisfactorily completed the first 7 years of his supervised release, the remaining 3 years shall be unsupervised. Both parties reserve the right to present evidence to the Court as to whether the Defendant has satisfactorily completed the terms of supervised release imposed. Other than active supervision by the Probation

17

Office, all the conditions of supervised release imposed by the Court, including the terms outlined in this plea agreement, will apply with equal force during any term of unsupervised release as they do during the supervised terms of supervised release. None of the Defendant's terms of supervised release shall be subject to early termination;

iv.  in addition to conditions deemed appropriate by the Court or the United States Pretrial Services and Probation Office, conditions of the Defendant's supervised release for the terms of supervised release imposed as to each Count to which he is pleading guilty shall include the following:

(1)  the Defendant understands and agrees that he has a continuing legal obligation to refrain from the unauthorized oral or written disclosure of information belonging to the United States government. The Defendant shall not disclose, communicate, transmit or disseminate in any way any classified information, including Restricted Data. The Defendant understands and agrees that the law absolutely forbids him from disclosing, communicating, transmitting, or disseminating any classified information, including Restricted Data, without regard to where or how the Defendant learned of or came into possession of the classified information, including Restricted Data. The Defendant

18

further understands and agrees that he is absolutely prohibited from disclosing, communicating, transmitting, or disseminating any classified information, including Restricted Data, even if that information can be found in a book, on the internet, or in any other source that is publicly available or not. Thus, the Defendant understands and agrees that merely because classified information, including Restricted Data, may have appeared publicly does not make it unclassified. The Defendant further understands and agrees that he is prohibited from confirming or expanding upon the classification status or technical accuracy of any classified information, including Restricted Data, that may appear in any public source;

(2)     the Defendant shall not communicate, in any way, verbally or in writing, to include oral disclosures in person, telephoning, mailing, writing, faxing, texting, emailing, skypeing, blogging, sending, delivering, communicating, transmitting, or otherwise disseminating, information relating to classified subject areas to which the Defendant was exposed while at LANL, nuclear science, nuclear weapons, nuclear testing, weapons testing, computer codes, inertial confinement fusion, nuclear fusion, nuclear fission, and nuclear and fusion energy (hereinafter individually and collectively referred to as a "communication"), without first

obtaining the express written permission of the Department of Energy, Office of Classification ("DOEOC") to do so. Nor shall the Defendant collaborate on, consult about, or otherwise assist or be involved with any such communication with any other person without first obtaining the express written permission of the DOEOC to do so. In order to request the DOEOC's permission to make a communication, the Defendant must timely contact the DOEOC in writing for instructions on how to submit, and then must submit pursuant to those instructions, the contents of the proposed communication to the DOEOC for review at the following address: Mike Kolbay, U.S. Department of Energy, Health, Safety, and Security, HS 93 (GTN) 1000 Independence Avenue SW, Washington, D.C. 20585-1290, unless the Defendant is later instructed in writing by the DOEOC to submit the proposed communication in a different way or to a different entity or address. The DOEOC is not required to grant permission to the Defendant and the manner and timeliness of the DOEOC's review, as well as the manner and timeliness of information provided to the Defendant about the review, are solely within the discretion of DOE. DOE may, at their sole discretion, give the Defendant a limited clearance for the sole purpose of enabling conformance of any submission to classification requirements. The application of

20

this paragraph shall include, but not be limited to, any interviews of the Defendant, or anyone representing or acting on behalf of the Defendant, by the media or others, any documents the Defendant writes or has written in whole or in part, and any other papers, books, writings, blogs, articles, films or other productions relating to the Defendant, the Defendant's time at LANL, and his disputes (scientific or otherwise with LANL, the government of the United States or any of its agencies, including DOE), the Defendant's scientific research or the events leading to his convictions. Any written communication sent by DOEOC to the Defendant pursuant to this paragraph shall be sent to the Defendant care of the United States Probation Office, 333 Lomas Blvd. NW, Albuquerque, New Mexico 87102;

(3)     the Defendant hereby assigns to the United States any compensation, profits, proceeds, fee, honorarium, money, or payment of any kind (hereinafter individually and collectively referred to as "compensation") which he may otherwise be entitled to receive in connection with any publication or dissemination of information relating to his and his wife's activities in relation to Venezuela, the undercover agent (including all documents and information he provided by whatever means to the undercover agent), and the facts and circumstances from on or about October

21

of 2007 through the date of the Defendant's sentencing in this matter. This assignment shall include, but not be limited to, any compensation to be provided to the Defendant in connection with any book, writing, article, film, documentary, or other production. This assignment shall include all compensation for the benefit of the Defendant, regardless of whether such compensation is payable to himself or to others, directly or indirectly, for his benefit or for the benefit of the Defendant's associates or a current or future member of the Defendant's family. The Defendant shall not circumvent this assignment by assigning the rights to his or his wife's story to an associate or to a current or future member of the Defendant's family, or to another person or entity who would provide some financial benefit to the Defendant, to the Defendant's associates, or to a current or future member of the Defendant's family. Moreover, the Defendant shall not circumvent this assignment by communicating with an associate or a family member for the purpose of assisting or facilitating their profiting from a public dissemination, whether or not such an associate or other family member is personally or directly involved in such dissemination;

(4)     the Defendant shall have no contact with any foreign government or agents thereof, except with the express written

permission of the United States Probation Office, which shall not grant such permission without the written consent of the FBI. The Defendant shall not seek or accept, personally or through another person or entity, any benefit from any foreign government or agent thereof. Should such a benefit be received by the Defendant, or some person or entity on his behalf, the Defendant hereby assigns any such benefit to the United States; and

(5)     during all terms of supervised release, the Defendant's papers, documents, writings, computers, and all electronic devices capable of processing or storing writings shall be subject to search by the United States Pretrial Services and Probation Office without notice to the Defendant. The United States Pretrial Services and Probation Office is permitted to conduct such searches in coordination with and with the assistance of any federal law enforcement agency.

v.     the Defendant shall pay a $100.00 special penalty assessment as to each of the Counts to which he is pleading guilty as required by law; and

vi.     other than the items that have already been returned to the Defendant, the Defendant hereby abandons, forfeits, and relinquishes any right, title, or any other interest in all items seized by the FBI pursuant to search warrant or consent on October 19,

2009, including but not limited to the $20,000 in cash that was seized, and the Defendant expressly consents to the FBI destroying or retaining such items as the FBI sees fit without notice to the Defendant and for the Judgment in this case to contain an Order adopting this sub-paragraph.

b.      The Defendant recognizes that this plea agreement already has conferred a benefit upon him and that no downward departure or variance from the sentencing ranges agreed upon pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) is appropriate. The Defendant agrees that any sentence within the agreed upon sentencing ranges is a reasonable sentence and the parties are permitted to argue for any sentence within the agreed upon ranges. . The Defendant further recognizes that if the Court accepts this plea agreement, then the Court is not permitted to depart downward or vary from the sentencing ranges agreed upon pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). In return for the benefit conferred upon the Defendant by entering into this plea agreement, the Defendant agrees that the defense will not seek a downward departure or variance from the sentencing ranges agreed upon pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). If the defense, in violation of this paragraph, should nevertheless seek a downward departure or variance, the United States reserves the right, in its sole discretion, to treat this plea agreement with the Defendant as null and void and may, in its sole discretion, move to do so, and the Defendant will thereafter, irrespective of any applicable statute of limitations, be subject to prosecution for any criminal violation including, but not limited to, any crimes or offenses contained in or related to the Indictment or Information filed in this case, as well as perjury, false statement, and obstruction of justice and any other

crime committed by the Defendant during this investigation and prosecution. The Defendant further agrees not to oppose a motion filed by the United States in accordance with this paragraph and agrees that the Court should grant such a motion.

c.     Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing or at any other hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in connection with this plea agreement through sentencing in this case.

d.     The Defendant specifically acknowledges and agrees that the United States is in no way bound by the facts the Defendant has stated above and may provide to the Court (including the United States Pretrial Services and Probation Office) any information that the United States believes may be helpful to the Court.

10.     The Defendant understands and agrees that the Defendant will not be permitted to withdraw any of his guilty pleas unless, pursuant to Federal Rule of Criminal Procedure 11(c)(5), the Court rejects this plea agreement.

## DEFENDANT'S ADDITIONAL OBLIGATIONS

11.     The Defendant understands and agrees the Defendant's obligation to provide the United States Pretrial Services and Probation Office with truthful, accurate, and complete

information. The Defendant represents that the Defendant has complied with and will continue to comply with this obligation.

12. To help protect against the disclosure of classified information prior to or at sentencing, or while the Defendant serves his sentence, the Defendant agrees that upon the Defendant's signing of this plea agreement and continuing until the Defendant's terms of supervised release have all expired, the Defendant, or anyone representing or acting on the Defendant's behalf, will be bound by the terms of paragraph 9.(a)(iv)(1)-(5) and will not advance any arguments, make any filings, or offer any exhibits or testimony that would require the use of any of the procedures set forth in the Classified Information Procedures Act, 18 U.S.C. App. 3. The Defendant intends to make a statement to the Court at the sentencing hearing in this matter and to present evidence and argument to the Court. The Defendant agrees that he will submit in writing to the Classified Information Security Officer ("CISO") or her designee at least 60 days prior to sentencing any statement, evidence, or argument he intends to make or provide to the Court. The CISO will provide such statement to DOE for a classification review. If DOE determines that the Defendant's proposed statement, evidence, or argument contains classified information, DOE will, to the extent possible, provide the Defendant with a redacted, unclassified version of the statement, evidence, or argument prior to the sentencing hearing. The Defendant agrees that he will abide by DOE's classification decisions and will present to the Court only a statement, evidence, or argument that has been confirmed by DOE to be unclassified. To further those protections, the Defendant also agrees that, upon the Defendant's signing of this plea agreement and continuing until sentencing in this matter, the Defendant, or anyone representing or acting on the Defendant's behalf, will have no contact, in whatever form,

26

with the media. To further help protect against the disclosure of classified information, the Defendant agrees to provide counsel for the United States with a redacted, unclassified copy of the Defendant's statement described above no later than two weeks prior to the date of the Defendant's sentencing.

13.     The Defendant agrees that no later than 30 days following his sentencing hearing he will, through his attorneys, return to the United States all discovery provided by the United States in this case. The Defendant expressly consents to the United States destroying or retaining these items as it sees fit without notice to the Defendant.

14.     The Defendant understands and agrees that this plea agreement with the United States is based upon an understanding that Marjorie Roxby Mascheroni will also enter guilty pleas pursuant to a plea agreement with the United States that includes a sentencing range, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), of not less than 12 months nor more than 24 months imprisonment. Should Marjorie Roxby Mascheroni fail to enter guilty pleas pursuant to a plea agreement with the United States, or should she, following such pleas attempt to, in any way, including pursuant to 28 U.S.C. § 2255, seek to withdraw or otherwise nullify any of her guilty pleas, the United States shall have the absolute right to declare this plea agreement with the Defendant null and void and may, in its sole discretion, move to do so. The Defendant expressly agrees that he will not oppose a motion filed by the United States in accordance with this paragraph, that the Court should grant such a motion, and that the Defendant would thereafter, irrespective of any applicable statute of limitations, be subject to prosecution for any criminal violation, including but not limited to any crimes or offenses contained in or related to the charges in the Indictment or Information in this case, as well as

27

perjury, false statement, obstruction of justice, and any other crime committed by the Defendant during this investigation and prosecution.

## WAIVER OF APPEAL RIGHTS

15.     The Defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.  Acknowledging that, the Defendant knowingly waives the right to appeal the Defendant's convictions and sentences, except to the extent, if any, that the Court may impose a sentence that differs from that agreed to by the parties under Federal Rule of Criminal Procedure 11(c)(1)(C).  The Defendant further waives any right he may have to additional disclosures from the United States in connection with the Defendant's guilty pleas.  In addition, the Defendant agrees to waive any collateral attack to the Defendant's convictions and sentences pursuant to 28 U.S.C. §§ 2241 or 2255, or any other writ, except on the issue of counsel's ineffective assistance in negotiating or entering this plea or this waiver.

## UNITED STATES' AGREEMENT

16.     Provided that the Defendant fulfills the Defendant's obligations as set out in this plea agreement, the United States agrees that the United States will not bring additional criminal charges against the Defendant arising out of the facts forming the basis of the present Indictment or the Information to be filed at the Defendant's plea hearing.

17.     Provided that the Defendant fulfills the Defendant's obligations as set out in this plea agreement, the United States agrees that the United States will move to dismiss the remaining Counts of the Indictment in this case as to the Defendant following sentencing.

18.     This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

19.     The Defendant agrees and represents that his guilty pleas are freely and voluntarily made and are not the result of force, threats, or promises (other than the promises set forth in this plea agreement).  The Defendant also represents that the Defendant is pleading guilty because the Defendant is in fact guilty.

## VIOLATION OF PLEA AGREEMENT

20.     The Defendant agrees that if the Defendant violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and may, in its sole discretion, move to do so, and the Defendant will thereafter, irrespective of any applicable statute of limitations, be subject to prosecution for any criminal violation, including but not limited to any crimes or offenses contained in or related to the charges in the Indictment or Information in this case, as well as perjury, false statement, obstruction of justice, and any other crime committed by the Defendant during this investigation and prosecution.  The Defendant further agrees not to oppose a motion filed by the United States in accordance with this paragraph and agrees that the Court should grant such a motion.

## SPECIAL ASSESSMENT

21.     At the time of sentencing, the Defendant will tender to the United States District Court, District of New Mexico, 333 Lomas Blvd. NW, Suite 270, Albuquerque, New Mexico

87102, a money order or certified check payable to the order of the **United States District Court** in the amount of $1,100 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

22.     This document is a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.  The parties agree and stipulate that this plea agreement will be considered part of the record of the Defendant's guilty plea hearing as if the entire plea agreement had been read into the record of the proceeding.  This plea agreement is effective upon signature by the Defendant and an Assistant United States Attorney.

AGREED TO AND SIGNED this 21st day of June , 2013.

KENNETH J. GONZALES
United States Attorney

FRED J. FEDERICI
HOLLAND S. KASTRIN
DEAN TUCKMAN
Assistant United States Attorneys
Post Office Box 607
Albuquerque, New Mexico 87102
(505) 346-7274

30

I am Pedro Leonardo Mascheroni's attorney. I have carefully reviewed and discussed every part of this plea agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, of the provisions of Federal Rule of Criminal Procedure 11, and of the consequences of pleading guilty and entering into this plea agreement. To my knowledge, my client's decision to plead guilty and to enter into this plea agreement is an informed and voluntary decision.

ROBERT COOPER
Attorney for the Defendant


KIRTAN KHALSA
Attorney for the Defendant


RICHARD WINTERBOTTOM
Attorney for the Defendant


I have read this plea agreement and I have carefully reviewed and discussed every part of it with my attorneys. I understand the terms of this plea agreement and I voluntarily agree to those terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, of the provisions of Federal Rule of Criminal Procedure 11, and of the consequences of pleading guilty and of entering into this plea agreement. No promises have been made to me and no inducements have been given to me other than those contained in this plea agreement. No one has threatened or forced me in any way to enter into this plea agreement. I am satisfied with the representation of my attorneys in this matter.

PEDRO LEONARDO MASCHERONI
Defendant

31